# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
June 17, 2003 Session

## STATE OF TENNESSEE  v.  VERNICA SHABREE WARD

**Direct Appeal from the Criminal Court for Davidson County**
**No. 99-D-2836     Cheryl Blackburn, Judge**

---

**No. M2002-01816-CCA-R3-CD - Filed December 30, 2003**

---

Defendant, Vernica Shabree Ward, appeals her conviction for second degree murder following a jury trial in the Davidson County Criminal Court.  The victim was her daughter Stephanie Ward. Defendant was sentenced to twenty-five years in confinement.  In this appeal as of right, Defendant presents eight issues for our review: (1) whether the trial court erred by allowing expert testimony by two witnesses based in part upon the deaths of two other children in addition to the victim in this case; (2) whether the trial court abused its discretion by allowing an expert to testify as to Defendant's prior attempts to seek medical treatment for Stephanie and that Defendant had other living children; (3) whether the trial court erred by ruling that testimony regarding the statistical improbability of three unexplained infant deaths in the custody of the same caregiver would be admissible by the State as rebuttal proof if Defendant raised the issue of accident or mistake; (4) whether the trial court erred by allowing Dr. Case to testify despite the fact that defense counsel was unable to meet with Dr. Case prior to trial; (5) whether the testimony of the two medical experts at trial was cumulative; (6) whether the trial court properly denied Defendant's request for a mistrial based on the State's closing argument; (7) whether the evidence was sufficient to convict Defendant of second degree murder; and (8) whether the trial court properly sentenced Defendant to twenty-five years imprisonment.  After a careful review of the record, we reverse the judgment of the trial court and remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Reversed and Remanded for New Trial**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, J., joined.  JOHN EVERETT WILLIAMS, J., filed a concurring opinion.

Ross E. Alderman, District Public Defender; Richard Tennent, Assistant Public Defender; C. Dawn Deaner, Assistant Public Defender; and Jeffrey Devasher, Assistant Public Defender, for the appellant, Vernica S. Ward.

Paul G. Summers, Attorney General and Reporter; Helena Walton Yarbrough, Assistant Attorney General; Victor S. Johnson III, District Attorney General; Katrin Miller, Assistant District Attorney General; and Brian Holmgren, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

**Facts**

On June 1, 1998, Defendant and her six-month-old daughter Stephanie Ward were living in a two-bedroom duplex with Defendant's sister and brother-in-law, Monica and Antwoine Wilson, their son Antonio, and their friend Alberita Rochelle Marsh. Ms. Marsh slept in the living room, Mr. and Mrs. Wilson and their son slept in one bedroom, and Defendant and her daughter both slept in the other bedroom on a mattress on the floor. Sometime early that morning, Ms. Marsh was awakened by Defendant and Ms. Wilson talking. Ms. Marsh saw Stephanie playing in her bedroom. At around 8:00 a.m., Defendant awakened Ms. Marsh and asked her to watch Stephanie while she left the apartment. Ms. Marsh agreed and then fell asleep again. She was later awakened by Defendant "hollering" her name. Ms. Marsh testified that Defendant sounded "frightened." Ms. Marsh jumped up and went into Defendant's bedroom. She saw Defendant sitting down, holding Stephanie. Ms. Marsh testified that Stephanie "had a purplish color to her. She looked like she was dead. She was not breathing." Ms. Marsh called 911. Within five minutes, an ambulance arrived and transported Stephanie and Defendant to Vanderbilt Medical Center.

James Jobe, a paramedic for the Nashville Fire Department, responded to the call from Defendant's residence on June 1, 1998. He arrived at 8:57 a.m. and was met at the front door by a firefighter who had already arrived and was administering CPR on the child. Mr. Jobe instructed the firefighter to carry the child to the ambulance, and Mr. Jobe administered CPR. Mr. Jobe testified that Stephanie was "clinically dead," explaining that she had no detectible heartbeat, she was not breathing, and she was unconscious. Mr. Jobe received information from Defendant that Stephanie did not take any medications, had no medical history, and was not allergic to any drugs. He also learned from Defendant that she had given Stephanie a bottle of water, laid her down on the bed, and found her unresponsive one hour later. Mr. Jobe did not see any marks or wounds on the child. He testified that "there was a large amount of frothy, yellow secretions coming from the child's mouth."

The paramedics were unable to resuscitate Stephanie before she arrived at the hospital. After Stephanie arrived at Vanderbilt Hospital, doctors successfully resuscitated her, but she was later declared "brain dead," and she was taken off life support and died on June 3, 1998.

Doctor Churku Reddy, Stephanie's pediatrician, testified that Stephanie was born on November 19, 1997. Dr. Reddy saw Stephanie for a total of six visits, and he administered three sets of vaccinations to Stephanie. At each visit, Stephanie appeared healthy, and she gained weight between her visits to Dr. Reddy.

Carolyn Orr, a social worker for the pediatric intensive care unit at Vanderbilt, testified that she met with Defendant on the morning of June 1, 1998. Defendant told Ms. Orr that Stephanie had seemed fine on the previous day. Stephanie woke up early that morning, and Defendant gave her a bottle of water. Stephanie played for a while and then fell asleep. Defendant checked on her approximately one hour later and found her blue and unresponsive.

Detective Ron Carter, of the Metropolitan Police Department, was assigned to investigate the death of Stephanie Ward. Detective Carter testified that on June 2, 1998, he spoke to Defendant, Monica Wilson, and Rochelle Marsh at the hospital. They were cooperative and gave their permission to Detective Carter to take pictures and collect evidence at their house.

Detective Carter took a statement from Defendant at the hospital. Defendant stated that on June 1, 1998, Stephanie woke up at approximately 6:00 a.m. She was playful, and Defendant gave her a bottle of water. Stephanie crawled onto the mattress and fell asleep. Defendant laid Stephanie on her stomach and then began packing her clothes. Defendant told Detective Carter that she later found Stephanie not breathing and not responsive. There was water coming from her mouth and nose. Defendant called for Ms. Marsh, and Ms. Marsh called 911. The 911 operator instructed Ms. Marsh on how to perform CPR, and Defendant gave her daughter CPR.

Detective Carter interviewed Defendant again on December 7, 1999, after she had been charged and arrested in this case. Defendant signed a waiver of rights form. She stated that she had been living with her sister, Monica Wilson, her sister's husband, Antwoine Wilson, their four-month-old son Antonio, and Rochelle Marsh. Defendant told Detective Carter that "Stephanie was constantly sick." Defendant stated that on the night before Stephanie's death, Defendant fed her Enfamil, a bowl of cereal, and spaghetti, and she took Stephanie to her grandmother's house. On the morning of the incident, Defendant woke up at approximately 6:00 a.m. Stephanie also woke up, and Defendant changed her diaper. Stephanie was crawling around. Her sister left to go to work between 6:30 and 7:00 a.m. Her sister's husband took her sister to work, and he took their son to his mother's house. Defendant stated that Ms. Marsh was awake, but she was lying on the floor in the living room where she slept. Defendant gave Stephanie a bottle of water because she had been told to give her Pedialyte and water for twenty-four hours. Defendant and her sister had a confrontation the previous night about Defendant not washing the dishes, and that morning, Defendant was packing to move to her mother's house. Defendant had a doctor's appointment at 9:00 a.m. that morning. Defendant asked Ms. Marsh to watch Stephanie while she got ready for her appointment. Defendant saw Stephanie drink a bottle of water and lie down. Ms. Marsh was in the bedroom with Stephanie while Defendant was getting ready in the bathroom. Defendant took approximately twenty minutes to get herself ready. When she returned to the bedroom, Ms. Marsh left the room. Stephanie was lying on a pillow on the bed. Defendant stated:

> I thought Stephanie was sleeping. But when I picked her up, she wasn't breathing at all. And the water I gave her to drink was coming out of her nose, and I called Rochelle and asked her what happened. She said she didn't know, and I was trying to call 911 and did CPR at the same time.

Defendant stated that she called 911, and she told the 911 operator that her "baby wasn't breathing and she had water coming from her nose and mouth." The 911 operator directed Defendant to perform CPR and asked if anyone else was there with her. Defendant handed the phone to Ms. Marsh. Defendant further stated:

> Rochelle is lying if she told you she was asleep because I know what I asked Rochelle to do. I know what she did. I know for a fact that she was in the room with Stephanie, and she was right there when I came in. I don't know what happened to Stephanie. I thought maybe it had something to do with her being sick. I believe Rochelle harmed my child. The only thing that I did to my child was to fix her a bottle of water. I did not harm my child. I never did confront Rochelle about this. I never spoke to her after this. I didn't say anything to her because I knew I would get in trouble. It's a possibility my baby was smothered, but I don't know. I don't know if she did it with a pillow. I had some garbage bags that I was packing my jeans in. She could have done it with a bag. I don't know. I really don't know. I know that she's claiming now that she's lost her memory. I did tell my mom that I thought she did this. I want you to find Rochelle and talk to her about this.

Detective Carter testified that Defendant gave information that she had omitted from her first statement, given on June 2, 1998. In her original statement, Defendant did not mention that she had asked Ms. Marsh to watch Stephanie or that Ms. Marsh went into the bedroom to watch her. Also in June, 1998, Defendant did not blame Ms. Marsh for Stephanie's condition.

Detective Carter testified that he interviewed Rochelle Marsh on June 2, 1998, and he interviewed her again after she had "lost" and then regained her memory of the incident. He testified that Ms. Marsh's statements from both interviews were consistent. Detective Carter testified that on June 2, 1998, at the hospital, Ms. Marsh told him that Defendant had given Stephanie a bottle at approximately 11:00 p.m. on May 31, 1998. Detective Carter spoke to Ms. Marsh again on August 27, 1998, and she told him that she couldn't remember who had fed Stephanie the bottle. Ms. Marsh told Detective Carter for the first time on August 27, 1998, that Defendant had asked her to watch Stephanie while she went to a doctor's appointment and that she fell asleep and was awakened by Defendant's screams. Detective Carter spoke to Ms. Marsh again on December 8, 1999, and Ms. Marsh told him that she had experienced a memory loss and could not remember the past four or five years. Ms. Marsh also told Detective Carter that she had seen a picture of Defendant on television in relation to Defendant's arrest in this case. On June 19, 2000, Ms. Marsh still had no recollection of the events surrounding Stephanie's death. On August 7, 2000, Ms. Marsh called Detective Carter and told him that she had regained her memory. Detective Carter interviewed Ms. Marsh, and she told him that she remembered giving Stephanie a bottle of either milk or water the night before the incident. She also remembered Defendant asking her to watch Stephanie on the morning of the incident while Defendant went to an appointment, falling asleep, and being awakened by Defendant's screams.

Dr. Mary Case, a forensic pathologist and Chief Medical Examiner in five Missouri counties, testified that throughout her career, she had conducted nearly 10,000 autopsies, and several hundred of those were of children under the age of six. Dr. Case was accepted by the trial court as an expert witness in the area of forensic pathology. Dr. Case testified that in connection with this case, she had reviewed the victim's autopsy report, prepared by Dr. Emily Ward, photographs of the victim and the death scene investigation, tissue slides from the autopsy, medical records and family history, police reports, and Defendant's statements to the police.

Dr. Case testified that in her opinion, Stephanie's cause of death was asphyxiation and the manner of death was homicide. Dr. Case testified that Stephanie stopped breathing less than thirty minutes prior to the time she was found unresponsive. Stephanie had been without oxygen for a period of time sufficient to cause irreversible brain damage, but her heart was beating slowly. At the hospital, doctors were able to resuscitate her, and she lived on a ventilator for two days. Dr. Case reviewed the hospital records, which included extensive tests, and nothing was revealing as to the cause of Stephanie's death.

Dr. Case testified that vomiting was not the cause of the asphyxiation because nothing appeared to be wrong with Stephanie neurologically. Dr. Case explained that when a person is deprived of oxygen, he or she will struggle, but in small children, asphyxiation does not leave any physical marks or indications of a struggle. Based on the condition in which Stephanie was found, Dr. Case opined that Stephanie was probably unable to breathe for several minutes. Dr. Case also testified within a reasonable degree of medical certainty that Stephanie did not die as a result of accidental suffocation.

Dr. Case testified that her review of Stephanie's medical history revealed that Defendant had called 911 on two prior occasions, complaining that Stephanie was having difficulty breathing. When medical personnel responded, nothing was found to be wrong with Stephanie, and she appeared to be normal. Dr. Case testified that the significance of these occurrences is that "if you look at the past history of children that have been asphyxiated, you will frequently find that there's a past history of statements made that they were having difficulty breathing and that medical attention may have been called about those problems."

Dr. Case testified that the family medical history revealed that two other children had died of unexplained causes while in Defendant's care. Stephen Ward, Defendant's son, was born on April 15, 1995, and he died on August 16, 1996. Alexis Humphreys was born on October 10, 1996, and died on February 25, 1997. She was the daughter of Bobbie Humphreys, a friend and roommate of Defendant. Dr. Case testified that she reviewed the autopsies of those two children, which were performed by Dr. Miles Jones. The autopsies of all three children were "negative autopsies," meaning that nothing was revealed by the autopsy that would explain why the children died. Dr. Case testified that she considered Sudden Infant Death Syndrome (SIDS) as a possible cause of death of Stephanie Ward, but ruled it out because of the fact that two other children had died while in Defendant's care.

Regarding Stephen Ward's death, Dr. Case testified as follows:

The circumstances were that this was a little boy over a sixteen-month-old little boy, otherwise totally healthy normal little boy that died on August 16, 1996, around 2:30 in the afternoon. This child was doing his usual activities. He was present alone with the mother, when about ten minutes after the mother last saw him, at which time he was perfectly fine. On reentering the living room, the mother found him laying on his back on the floor holding a baby bottle and was essentially at that time was unresponsive and dead. The past medical history was unrevealing as to any explanation. There's no chronic illness or illness about which you would expect this child to die. There was no explanation from the family's history. The autopsy did not provide any kind of information that would explain his death.

Stephen Ward was found lying on his back on the floor when he died. Children who die from SIDS are, by definition, less than one year old. Because Stephen was sixteen months old at the time of his death, SIDS was ruled out as a cause of death. The police report concerning Stephen Ward's death revealed that another infant death had occurred in his father's family history.

Regarding the death of Alexis Humphreys, Dr. Case testified as follows:

The information provided [by Defendant] was that Alexis was a four-month-old child who was the daughter of a friend with whom Ms. Ward was living at that time and had been living for one month. The mother of Alexis, when she would go out, Vernica Ward would babysit for Alexis. That was something that had been previously done. And on February 25, 1997, on the day when Alexis died, about 12:00 noon, the mother gave Alexis some Amoxicillin, an antibiotic. The child had been at the doctor a week and a half before and had some bronchitis and was still on an antibiotic. The child was then fed and left in the care of Vernica Ward. About 12:30, I think the child was fed, and then was put down for a nap. And subsequently around 2:30 in the afternoon was found by Vernica Ward unresponsive, and there was some fluid coming out of the child's nose or mouth.

That account of the circumstances surrounding Alexis Humphreys' death was provided by Defendant in a statement to the police on February 25, 1997. In that statement, Defendant indicated that she was the sole caretaker of Alexis Humphreys at the time of Alexis' death. In two subsequent statements to the police, Defendant claimed that Alexis' mother, Bobbie Humphreys, and her boyfriend had left the residence only a few minutes prior to the child being discovered not breathing, and that Defendant was not responsible for taking care of the child. Defendant stated that Ms. Humphreys left Alexis sleeping in a bedroom, and that two minutes after Ms. Humphreys left, two teenage boys came into the house and were making noise. Defendant told them that the baby was sleeping. One of the boys looked inside the bedroom where Alexis was sleeping and found the child unresponsive. Although Josh Humphreys and Alphonso Carney were present when Alexis died, they

-6-

were not interviewed. Dr. Case testified that the inconsistency in Defendant's statements was significant to her conclusions regarding the death of Stephanie Ward because it "mean[t] one of those stories was not true, that there was untruthfulness in one of the stories."

In forming an opinion as to Stephanie's cause of death, Dr. Case reviewed the following information regarding Alexis Humphreys' death. A death scene investigation was conducted of Alexis Humphreys' death, and photographs were taken. Alexis had been sleeping on an adult bed on her stomach, and a blanket and pillow were on the bed. She was four months old when she died. Dr. Case also reviewed a summary of Alexis Humphreys' medical history, which revealed that Alexis' maternal grandmother had two children who died as infants. At the time Alexis was born, Bobbie Humphreys was using cocaine. At the time of Alexis' death, Ms. Humphreys was under investigation by the Department of Children Services.

Dr. Case testified that in forming her opinion, the fact that Stephanie Ward and Alexis Humphreys were not related was helpful in ruling out a genetic disorder. Dr. Case testified that the fact that Defendant had two living children was also helpful to the determination of whether Stephanie died from a genetic defect, a metabolic disorder, or a congenital anomaly.

Dr. Case testified that she had reviewed other cases involving multiple infant deaths in the care of a single caretaker, and those cases "happen rarely, but they're very notable." The unexplained deaths of Alexis and Stephen heavily influenced Dr. Case's opinion regarding Stephanie's cause of death and led her to conclude that Stephanie died as a result of homicide by asphyxiation.

Dr. Bruce Levy, the medical examiner for Davidson County, investigated Stephanie Ward's death. Dr. Levy testified that Dr. Emily Ward performed the autopsy. Dr. Levy reviewed a written report prepared by Dr. Ward, which summarized her findings and conclusions. Dr. Ward concluded that the cause of Stephanie's death was suffocation and the manner of death was homicide. Dr. Levy testified that in making that determination, he and Dr. Ward relied on the findings of Stephanie's autopsy, her medical records, as well as information regarding the deaths of Stephen Ward and Alexis Humphreys.

Dr. Levy interviewed Defendant as part of the medical examiner's initial investigation. During that interview, Defendant did not reveal the deaths of the two other children. When asked whether there had been any prior SIDS related deaths in the family, she responded only that her grandmother's sibling had died of SIDS.

During the time Stephanie was at Vanderbilt Hospital before she died, extensive testing and screening was performed, but those tests failed to explain her death. Dr. Levy reviewed Stephanie's medical history. Stephanie had been taken to the emergency room on one prior occasion. On another occasion, Defendant took Stephanie to a pediatrician, complaining that Stephanie "had been breathing funny or had turned pale or turned blue." Dr. Levy explained the significance of these two incidents:

[I]n many cases where children have been asphyxiated or have been abused by parents, there are prior visits for what's referred to in the medical community as acute life threatening events. So Stephanie had a couple of those events. And those are things that we tend to see in cases where there have been deaths of children that are caused by other people.

Dr. Levy further testified that there was nothing from the death scene investigation that suggested that Stephanie died from accidental suffocation. Dr. Levy did not consider SIDS a likely cause of death for two reasons: "the major one being the deaths of the two prior children;" the other reason was because of the conflicting information received from Defendant regarding her daughter's death. Dr. Levy testified, "obviously, one or more of those stories are not true," and that "changing stories. . . become very concerning to us when we're investigating a death." Dr. Levy testified that Defendant also gave inconsistent statements regarding the deaths of the other two children, "most striking for Alexis Humphreys." Dr. Levy also explained that the fact that Stephanie stayed alive in the hospital for days following her death is not typical in SIDS cases. In those cases, children are not "revivable." Dr. Levy estimated that Stephanie was deprived of oxygen for approximately three to four minutes. He further estimated that she struggled for approximately one minute.

Defendant did not present any proof in this case.

## ANALYSIS

### I.    Expert Testimony

#### A.    "Rule of Three" as Basis of Expert Opinion

In her first issue, Defendant argues that the trial court committed reversible error by allowing into evidence the testimony of Dr. Case and Dr. Levy because they both essentially relied upon the "rule of three" as a basis for their expert opinions. Defendant argues that the expert opinions in this case did not meet the admissibility requirements of Tenn. R. Evid. 702 and 703 and the standards set forth in *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257 (Tenn. 1997).

Tennessee Rule of Evidence 702 provides:

If scientific, technical, or other specialized knowledge will *substantially assist* the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

(Emphasis added).

The trial court correctly summarized the "rule of three" based upon the testimony at the pretrial hearing as follows:

> It is Dr. Case's use of an additional source of information as foundation for her expert opinion testimony that gives this Court cause for concern. According the testimony presented to the Court in the hearing on this issue, Dr. Case intends to testify that each of the three alleged victims died as a result of homicidal asphyxiation perpetrated by the defendant. Dr. Case's primary authority for this conclusion is what she describes as a general rule with regard to multiple deaths where a minimum number of three deaths occur where there is no known disease or trauma and no known explanation for the deaths. The three-death rule, or the "rule of three," as Dr. Case describes it, follows the theory that if cause of the first death is initially attributed to SIDS, the cause of the second death is changed from a SIDS classification to an "uncertain" or "undetermined" classification. And, finally, the cause of the third and subsequent deaths is considered a homicide if there is no known cause. In other words, the manner of the first child's death is changed from SIDS to homicide where two or more children die without explanation.

> Tennessee Rule of Evidence 703 states:

>> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. *The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.*

(Emphasis added).

In *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d at 258, our supreme court granted interlocutory appeal "to clarify the standards for admissibility of scientific evidence under Tennessee Rules of Evidence 702 and 703." In addressing the issue, the Court recognized that, "[i]n general, questions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court. *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993). The trial court's ruling in this regard may only be overturned if the discretion is arbitrarily exercised or abused." *McDaniel*, 955 S.W.2d at 263-64.

In addition to determining whether the expert testimony will substantially assist the trier of fact in determining a fact issue, the trial court must also determine whether or not the data and facts underlying the expert opinion testimony indicate a lack of trustworthiness. *Id*. at 265.

[Tennessee Rules of Evidence 702 and 703] necessarily require a determination as to the scientific validity or reliability of the evidence. Simply put, **unless the scientific evidence is valid,** it will not substantially assist the trier of fact, **nor will its underlying facts and data appear to be trustworthy,** but there is no requirement in the rule that it be generally accepted.

*Id*. (Emphasis added).

The supreme court in *McDaniel* also listed several nonexclusive factors that trial courts may consider when determining the reliability of the facts and data underlying the expert testimony:

(1) whether the scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether . . . [citation omitted] the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

*Id*. The trial court must be assured that the expert opinion testimony is based upon relevant scientific data, methods, and processes and **not** upon the "mere speculation" of the expert. *Id*. With these basic premises in mind, we will examine both the pretrial and trial testimony of each expert witness.

*Pretrial Hearing*

Both experts testified at the pretrial hearing on this issue. Dr. Case testified that the District Attorney General's office requested her consultation regarding the deaths of Stephanie Ward, Stephen Ward, and Alexis Humphreys. Dr. Case reviewed the autopsy reports, medical records and reports for all three children, slides of the tissue samples, death scene photographs of Stephanie's and Alexis' deaths, medical records and reports for all three children, police reports from the investigations in all three deaths, transcribed and audio taped statements made by Defendant, and transcripts of deposition testimony of Defendant during juvenile court proceedings.

The record reflects that the first child to die, Stephen, died in August, 1996. The second child, Alexis, died in February, 1997, and the third child, for whose death Defendant was tried in this case, died in June, 1998.

Dr. Case testified that upon review of all the relevant materials, she had formed an opinion, within a reasonable degree of medical certainty, that each of the three children had died as a result of asphyxiation, and that the manner of death in each case was homicide. She based this conclusion upon her findings after reviewing the autopsy reports, which revealed no known cause of death for any of the children. Dr. Case stated that asphyxiation, or the exclusion of oxygen from the body is "a type of mechanism that you can do to a young child and leave nothing that can be detected. It

-10-

does not leave a mark on the body. It does not leave any kind of a sign or a stigma or any kind of a pathological change that allows us to recognize when asphyxiation has been done."

Dr. Case testified that extensive tests were performed in order to determine each of the three children's causes of death, and there was nothing to suggest a cause of death other than asphyxiation, even in light of the fact that asphyxiation usually "does not provide any findings" in young children. Dr. Case explained that her opinions were based not only on the autopsy reports, but also on the fact that there were three children who died while in the care of the same individual. She noted that this was "highly significant." During direct examination in the pretrial hearing, Dr. Case acknowledged that:

> **[w]ithout these children in the care of the same individual**, I would not be calling them homicide in the same way. They might be homicides for different reasons if those kinds of findings were present, but in these, in this case, **it requires** the three children, **that there have been three child deaths in the care of this individual** [Defendant]. (Emphasis added).

In other words, Dr. Case testified, if she had considered the death of each child independently, her opinion as to the cause and manner of death for each child would be "undetermined." Dr. Case acknowledged that in order to conclude within a "reasonable degree of medical certainty" that each child died from asphyxiation as a result of homicide, she necessarily considered the circumstances of all three deaths and the fact that each death occurred while in the care of the same individual. Dr. Case further testified that if she had only the information regarding the deaths of Stephen and Alexis she would classify the cause and manner of death for *both* children as "undetermined."

At the pretrial hearing, the parties stipulated that Dr. Levy, the Chief Medical Examiner for the State of Tennessee, was an expert in forensic pathology. Dr. Levy testified that he did not perform the autopsies of Stephanie, Stephen, or Alexis. He reviewed the autopsy reports for all three children. He also reviewed tissue slides, photographs, the children's medical records, police reports, and Defendant's statements to the police. Dr. Levy explained that,

> Sudden Infant Death Syndrome is defined by the National Institutes of Health is [sic] the death of an otherwise healthy infant under one year of age that remains unexplained after a thorough case investigation, which includes a complete autopsy, a review of the medical history, and an investigation or a scene investigation of the location of death or location the child was found unresponsive.

Dr. Levy testified that Stephen Ward's death could not be classified as a SIDS death because of his age at the time of death. Stephen was more than one year old. Although Alexis Humphreys' death was consistent with SIDS, considering "the fact that you had the same adult primary caregiver in the presence of this child as you did in the presence of another child who had died shortly before

in a very similar type of scenario," Dr. Levy could not classify her death as SIDS. Dr. Levy also testified that "there were glaring inconsistencies in the statement[s] of Ms. Ward regarding the events of that day [on which Alexis died]." Dr. Levy testified that "changing" or "discrepant" stories provided by a caretaker would be a significant factor in determining the manner and cause of death for all three children.

Dr. Levy testified that Stephanie's cause of death was asphyxiation caused by smothering and the manner of death was homicide. That conclusion was based on the absence of any "significant findings" from her autopsy and the fact that two other children had died while in Defendant's care.

Dr. Levy testified that the "rule of three" is generally accepted in the forensic community, but he described it as controversial. Dr. Levy agreed with the medical practice that with "multiple deaths in the same family of infants, each time your index of suspicion is going to get higher and higher." Dr. Levy testified, however, that he had "reservations" about following "the formula that the first death is natural; the second death is undetermined; and, the third death is homicide, no questions asked." Dr. Levy testified that he was aware of cases in which there were multiple deaths for which a natural cause was found.

Dr. Levy testified that Stephen and Alexis died from asphyxiation caused by smothering and their deaths were also homicides. Significant to Dr. Levy's conclusions were "the findings of the autopsy, the series of these three deaths together, the inconsistent statements of Ms. Ward, [and] the previous emergency room visits for the two related children. . . ." Dr. Levy testified that there was "a pattern here that you can't ignore, that these children were each asphyxiated."

While apparently disavowing the "rule of three" as too rigid of a formula, Dr. Levy did essentially incorporate the basic premise of the "rule of three" in reaching his expert opinion as to the cause and manner of death of all three children. That is, a necessary component of the foundation for Dr. Levy's expert opinion was the fact that three children had died in the sole care of Defendant for otherwise unexplainable reasons, medically or otherwise. For instance, at the pre-trial hearing, Dr. Levy testified as follows during cross-examination by Defendant's counsel:

[Defense Counsel]: And if I understand your previous testimony, that opinion has been based on two factors primarily, and that is that there were no significant findings at autopsy to explain or to give a reason or cause of death, one, and number two, that Ms. Ward was the caretaker of two other children who previously died without explanation; is that correct?

[Dr. Levy]: That is correct.

\* \* \*

[Defense Counsel]: Let me ask you sort of the same question, but considering that there are only two deaths, if you were faced with the situation where you had Stephen's death and then learned of Alexis' death, would Alexis' death be classified as a homicide; would you have classified it as a homicide?

[Dr. Levy]: That is a very hard question to answer because I'm trying to sort out what I do know that I have to take out. I'd say given the death - - given that the death of Stephen would be undetermined, and I think in my opinion would be very concerning because it is unexplained and you don't expect that a 17 or 18-month-old child, that I would look long and hard at the death of Alexis before I came to a conclusion. It would certainly not be a SIDS, but whether it would be undetermined or a homicide is difficult to answer, but it would be somewhere in between and be hard to sort out just sitting here on the stand.

[Defense Counsel]: Okay. A similar question regarding the other children. If you were faced with Stephanie's death and the information about Stephanie's death and the only other information you knew was that about Alexis' death, you didn't know about Stephen's death, would Stephanie's death have been ruled a homicide in that situation?

[Dr. Levy]: I think if we didn't have Stephen's death, and we were just dealing with Alexis and Stephanie, I would certainly call the death of Stephanie undetermined, based upon the details of that case and the existence of the previous case. I don't think - - I'm not sure, but my feeling would be we wouldn't have sufficient information to conclude that that was a smothering.

[Defense Counsel]: Okay. Instead of going through all the combinations, is there any combination of just two of these deaths, other than the ones that you said it was a difficult call regarding just Stephen and Alexis, are there any other combinations of just two of these childrens' deaths that would lead you to conclude, based upon two deaths, that they were a homicide?

[Dr. Levy]: I guess my answer would be probably no.

During redirect examination by the State at the pre-trial hearing, Dr. Levy further testified as follows:

-13-

| | |
|---|---|
| [Prosecutor]: | Does the fact that you have three children that have no physiological findings indicating a manner of death, is that significant to you in terms of your overall conclusions here? |
| [Dr. Levy]: | Yes, it is. |
| [Prosecutor]: | Can you determine the manner and cause of death of any child individually without considering them in their totality? |
| [Dr. Levy]: | Well, in my job as the Medical Examiner in determining any cause and manner of death, I like to rely on more than just physical findings of the autopsy. I mean, in many cases, the cause of death is obvious, but in many cases, you need a review of history, a review of the circumstances in order to come to a conclusion as to the cause and the manner of the death. |
| [Prosecutor]: | Let me rephrase the question and state it another way, Doctor. Assuming that we were to proceed to trial on this case, and you were precluded from considering information involving Alexis Humphreys or Stephen Ward in formulating your opinions and your conclusions, would you be able to testify that Stephanie Ward's death was the result of a homicide? |
| [Dr. Levy]: | No. I would say that without being able to discuss the first two children, I wouldn't be able to explain why I consider the death of a third child to be a homicide. |
| [Prosecutor]: | And would your answer be the same if you were asked that question as regards Stephen's death or Alexis' death individually? |
| [Dr. Levy]: | It would. You can't look at any of these three deaths in isolation. You have to look at all of them together in order to be able to explain these deaths. |

Regarding what was termed as the "rule of three" or the "three death rule" in the trial court and by the parties on appeal, Dr. Case testified during direct examination at the pretrial hearing as follows:

| | |
|---|---|
| [Prosecutor]: | Is there any general rule of thumb as regards multiple deaths in a particular family of children? |

[Dr. Case]: In a particular family, usually the number is – the one that is the minimum that you would require would be three.

[Prosecutor]: Tell us how that rule works.

[Dr. Case]: If you have children that are dying in circumstances in which there is no disease or trauma of any type, after very thorough examinations and scene examinations and there is just absolutely no explanation for the death of the child, with the first one, if it falls into a Sudden Infant Death category, that might be considered a Sudden Infant Death.

The second child in the family that dies should not be considered, again, if there is no findings at all, you cannot establish the cause of death, there is nothing that comes from the history except that there has been a preceding child dying in that family, you remove that child from the Sudden Infant Death category, because of the previous death. That is not a positive family history. The second child becomes a[n] undetermined cause of death and an undetermined manner.

There is suspicion with that second child that that is not a natural death, but that suspicion is not, it is just a suspicion. If there is a third child that dies in that situation where there is no, where you are totally unable to determine why the child has died, by that time, we consider those deaths homicide generally, if we are not able to establish a given cause of death.

[Prosecutor]: Do you consider only the third death to be a homicide, or all three deaths?

[Dr. Case]: I consider all three deaths, but it is not until I have the third death that I make that determination. While I may be suspicious at the second death, I'm going to make the determination at the third death, but I certainly consider the first and second to be homicides.

[Prosecutor]: Is that three death rule a generally accepted rule within the field of forensic pathology?

-15-

[Dr. Case]:          I don't really consider it a rule. It is a saying. It is kind of a procedure that is pretty regularly followed. I would think that there is very wide agreement with that procedure.

[Prosecutor]:        In your human experience both as a forensic pathologist and in discussions with other forensic pathologists across the country, are you aware of circumstances in which three children die natural deaths at the hands of one caretaker, while under the care, custody and control of one caretaker?

[Dr. Case]:          No. That has never been a circumstance that has come into my experience or the experience of anyone that has related that to me.

[Prosecutor]:        Do you have a fair degree of contact with other forensic pathologists across the country?

[Dr. Case]:          Yes, I do.

Dr. Case testified that this conclusion cannot be readily tested by normal research methods, but it has been the subject of case studies. She explained,

Particularly in the past ten years, it has become apparent that what used to be called multiple cases of Sudden Infant Death in a given family was actually someone killing those children, and so currently we do not accept more than one Sudden Infant Death in a family, and that there are collections of cases and some of those have had books that published books that have been written about people that have killed multiple children, but it is research based upon those kinds of case studies upon which I base part of my opinion.

Dr. Case also testified that she relied upon the circumstances of each death, including how each child was found, their physical placements, the surroundings, and the location or absence of objects near each deceased child. Dr. Case considered only the Defendant's original statements that indicated she was the sole caretaker of each child at the times they were found dead, and not on later apparent inconsistent statements which indicated otherwise.

Regarding the "rule of three," Dr. Case indicated in her testimony during cross-examination at the pretrial hearing that it was not based upon scientific evidence, but on experience:

[Defense Counsel]:   All right. And I would like to ask you, the general rule of procedure, what, where does that come from? Is that based upon scientific evidence or –

-16-

[Dr. Case]: That is based upon experience, as I previously indicated that in seeing what really happens, how these children die, once there is experience as to what is the reality of how children die when there is more than one child dying within a family and you are able to exclude other reasons for the child being [sic] dying, that when you have three children, in the case here where there are two children in a family and an unrelated one, those are circumstances which do not occur in the course of reality, that there is something wrong there, and that is the type of experience I'm talking about.

If you are not dealing with the kind of practice that might give you that experience, certainly you wouldn't come across that kind of information, but in general, I think that is how we come to that conclusion, by having experience with those kinds of cases.

[Defense Counsel]: All right. Well, is it then what you are saying is that because we have never seen this happen before, it could never happen?

[Dr. Case]: I'm saying that the reality of what actually happens is what we do know. I am not a subscriber to the idea as some people say anything could happen. I think that some things happen and other things do not, and I think that we are able to tell which do and which don't, so in that sense, I am not a subscriber to the idea that anything could happen.

Dr. Case further testified that in her twenty-five years of forensic pathology experience, she had observed five or six instances of multiple, otherwise unexplained child deaths with a single caretaker. She had no idea how many such cases have occurred in the United States, though she surmised that many are undiscovered, or not recognized.

Dr. Case stated that the prevailing opinion regarding the "rule of three" was set forth in a book written by Dr. Vincent DiMaio in the mid-1980's entitled *Forensic Pathology*. Drs. Case and Levy both testified that Dr. Vincent DiMaio and Dr. Dominic DiMaio had good reputations in the scientific community and that their book, *Forensic Pathology*, was well-respected. She acknowledged that the principle that "three deaths should be considered a homicide," was espoused in the Drs. DiMaios' book.

Dr. Vincent DiMaio did not testify at Defendant's trial, but our research revealed a summary of his testimony in a similar trial in Nevada. *See Buchanan v. State*, 69 P.3d 694 (Nev. 2003). In that case, the admissibility of expert testimony similar to the expert testimony presented in

Defendant's trial, was not at issue. In fact, expert witnesses who testified regarding the cause and manner of death of three children, whose causes of death were individually unexplainable, was presented by both the prosecution and the defense. The Nevada Supreme Court summarized Dr. Vincent DiMaio's testimony regarding the "rule of three" as follows:

> As a rebuttal witness, the State called Dr. Vincent DiMaio, chief medical examiner in San Antonio, Texas, professor in the department of pathology at the medical school in San Antonio, the editor of the American Journal of Forensic Medicine and Pathology, and coauthor of the treatise Forensic Pathology. Dr. DiMaio testified that he coined the forensic axiom regarding multiple, unexplained infant deaths in the same family. Dr. DiMaio explained the axiom by stating:
>
> > The way it's applied is when you get a first case that appears to be SIDS, you always treat it as SIDS. And you assume that this is a natural death. That's the way you should do it. **You should not be suspicious of the parents and such, and you know, be insulting, essentially.**
> >
> > In the second case, we know that in all probability it's not a SIDS. It's a homicide. But still, **you always give them the benefit of the doubt.** So, in the second case you always give them the benefit of the doubt, rather than be - - you would rather give too much away than to falsely accuse them. It's only when - - you get suspicious and you have the police investigate a second one. Do a lot more. **It's when you get to the third one, then you've gone beyond reasonable doubts and you have to call it a homicide.**

*Buchanan*, 69 P.3d at 703-04 (emphasis added).

Our disposition of the issue in this case is independent of Dr. Dimaio's expert testimony in *Buchanan*. However, his testimony in that case supports our conclusion that the "rule of three" as a foundation for the expert testimony is speculative.

Perhaps the most revealing explanation of the facts and data underlying Dr. Case's expert opinion is shown by her answers to the trial court's questioning near the conclusion of her testimony at the pretrial hearing:

| [The Court]: | Doctor, taking each death individually, each, do not rely on the others, can you tell me first of all what is unique and distinctive about Stephen's death? |
|---|---|
| [Dr. Case]: | Every child's death is distinctive. This is a 17-month-old child that had been previously healthy that had absolutely |

nothing wrong with him, and was found in a circumstance in which there was no mechanism to account for his death.

When you say what is distinctive, that is distinctive; that is, so it is all of the findings about his circumstance. His autopsy does not reveal a cause of death.

[The Court]: Okay, but what is – is there anything unique and distinctive other than that there is no cause of death?

[Dr. Case]: Well, that is a highly unique occurrence. That is not to say that we are able to establish a cause of death in every autopsy, everybody that dies. Sometimes we are not able to do that. We look very closely, but we can't.

In the case of a child of this age, it is extremely unlikely, although not impossible, that you can't have a child dying without an explanation, but it is still a matter of concern about which we kind of hold those cases in our mind and say, well, I wonder about that child. It is distinctly unusual enough that we ponder and worry about it.

[The Court]: Okay, so the unique and distinctive nature of his death is that there is no cause of death of a child of his age?

[Dr. Case]: That is correct.

[The Court]: Okay. Alexis, what is unique and distinctive about her death, separate and apart from anyone else, without relying on any other death?

[Dr. Case]: In the case of Alexis, without relying upon anyone else, there is nothing particularly distinct about her death.

[The Court]: And with regard to Stephanie?

[Dr. Case]: In the case of Stephanie, there is nothing in particular distinct about her in her own circumstance.

[The Court]: Okay, so his is the only that there is nothing unique, that is unique and of itself, that there is no cause of death?

[Dr. Case]: Well, there is no cause of death in any of them –

-19-

[The Court]:      Right.

[Dr. Case]:       – but he is in an age category where we do not classify him as a Sudden Infant Death.  In the case of the other two, they fall into an age category where as isolated examples, they could fit the SIDS criteria.

[The Court]:      **Okay.  Now if you were to have to testify on cause of death on any one of the three, separate and apart, could you give a cause of death?**

[Dr. Case]:       **No.**

[The Court]:      Now listening to what you said, is it my understanding that you decided this was a homicide first and then determined cause of death?

[Dr. Case]:       That is correct.  That is the usual way because the cause of death, why they die, like a gunshot wound or a stab wound, in the case of asphyxiation, there is nothing that tells us that this is asphyxiation.  You come to the decision that it is a homicide; that this is an unnatural death caused by another person, and then the mechanism by which it must have happened would be asphyxiation.  This is a –

[The Court]:      But you are saying that in general asphyxiation deaths, you know the cause or you don't know the cause.  I want to know, did you decide there are three unexplained deaths; therefore, it has to be a homicide; therefore, I now look for cause of death?

[Dr. Case]:       No.  No.  We have already looked for cause of death and we don't [sic] that we can see to explain the cause of death.

[The Court]:      Okay, so you have no cause of death, but because there is three, therefore homicide.

[Dr. Case]:       You have three children that are occurring in circumstances of this type, in the presence of a single individual, and that leads me to the conclusion after looking at those cases that these children have been caused to die, that these are not natural deaths.

-20-

[The Court]: Now another question is if the statements, and correct me if I'm wrong, did you presume that the statements she made at the time of their deaths, that is the defendant's statements, are the accurate statement; you made that presumption?

[Dr. Case]: I certainly made that presumption because later statements take her out of their presence.

[The Court]: **Right, so if the later statements, for example, if the jury were to find that the later statements that were made under oath were the accurate statements, then you could therefore say it is not a homicide; in other words, if the later statements are, in fact, the truth, which says she was not there, you therefore do not have a homicide in any of these cases?**

[Dr. Case]: **That is correct. If she is not there when the children died, if she is not available to cause them to die, certainly she hasn't killed them. If that is the truth, then she hasn't killed them, but if she was there, she killed them.**

[The Court]: So you are saying that you would testify in front of the jury not only as to homicide, that this defendant killed those children?

[Dr. Case]: Yes, in this case, that is what I would – and that is not usually the case. I can't tell from a gunshot wound or a stab wound who did that, but in the case of baby deaths with asphyxiation, it has to be the person who was there.

[The Court]: And that is based on your assessment, most particularly, presuming that her initial statements are the accurate version, not the other statements?

[Dr. Case]: It has to be the original versions because that is where she is in charge of the children. She has access.

[The Court]: So if that is inaccurate, for example, if she were in fact, covering up for someone else for whatever her motive, then you could not say any of these three was a homicide?

[Dr. Case]: I could not.

In a lengthy and detailed order, the trial court denied Defendant's motion to exclude the expert testimony of Dr. Case, but it placed limits on her testimony. The trial court found that "Dr. Case's *use and application* of the 'rule of three' is not a proper foundation upon which to base her expert opinion testimony, nor would it substantially assist the jury. Moreover, any mention of the 'rule of three' by Dr. Case in the State's case-in-chief is prohibited." (Emphasis added) (citations omitted).

Pre-trial, the trial court also prohibited Dr. Case from testifying (in the trial for the death of Stephanie) that the deaths of Stephen and Alexis were the result of homicide, and from referring to the "facts and circumstances surrounding [their deaths] that were not used to form the basis of her opinion. Rather, Dr. Case may testify that two other deaths occurred and that those deaths were among several factors considered when she formed the basis of her expert opinion testimony." In addition, the trial court put the same limitations upon the expert testimony of Dr. Levy.

### Trial Testimony

At the jury trial, following a jury out hearing, the trial court, over Defendant's objection, ruled that Dr. Case could testify that, in forming the basis of her expert opinion: (1) she considered Defendant's inconsistent statements regarding the deaths of Alexis and Stephanie and (2) that some of the statements were untruthful.

After testifying to her education, professional training, background, and experience, the trial court accepted Dr. Case as an expert witness in forensic pathology. At the point in Dr. Case's testimony where she began to discuss the deaths of Stephen and Alexis and how that helped in forming the basis of her expert opinion, the trial court instructed the jury as follows:

> Ladies and gentlemen, the facts, data, reasons, judgment and information upon which Dr. Case based her opinion may be those perceived or made known to her during the course of her investigation in the death of Stephanie Ward. However, any such information that is related to the deaths of Stephen Ward or Alexis Humphreys may only be considered by you for the limited purpose of determining whether Dr. Case's opinion as to the cause and manner of death of Stephanie Ward is based upon sound reasons, judgment and information. You may not consider that information for any other purpose.

Dr. Case's testimony during the jury trial, subject to the limitations placed on it by the trial court, was basically the same as at the pretrial hearing. Pertinent to the specific issue being addressed, the following testimony concluded her direct examination:

[Prosecutor]: I'm going to try and rephrase it, Doctor. Have you looked at other cases in your experience where there are multiple infant deaths involving a single caretaker?

[Dr. Case]:           Yes, I have.

[Prosecutor]:         And have you looked at similar types of cases involving cases that have been sent to you either as referrals or where you're talking with other pathologists that have had those kind of cases in their experience?

[Dr. Case]:           Yes, I have.

[Prosecutor]:         Do those kinds of cases happen a lot, Doctor, first of all?

[Dr. Case]:           They don't happen a lot. They happen rarely, but they're very notable. And they're collected by all forensic pathologists and we share those cases because they're of great interests. We're puzzled at the beginning, and so it's certainly very notable.

[Prosecutor]:         Does that collective experience, both in your own cases that you've looked at and in cases from other jurisdictions or cases that you've spoken about with other forensic pathologists, contribute to your conclusion here that Stephanie Ward's death is a result of homicide from asphyxiation?

[Dr. Case]:           Yes. That kind of information very much affects my opinion and causes me to make that opinion.

Pertinent to the issue being addressed, Dr. Levy's trial testimony included the following:

[Prosecutor]:         In connection with making that determination and in assisting Dr. Ward in making that determination, what information did you look at, receive and consider in forming that diagnosis?

[Dr. Levy]:           Well, we certainly reviewed the findings of the autopsy, the medical records of Stephanie Ward from the time of her birth until the time of her death. We reviewed the death of her sibling, Stephan Ward, who had died about two years earlier and had been autopsied by a prior medical examiner here in Tennessee. And we also reviewed the death of Alexis Humphreys and the circumstances surrounding that death, also performed by a prior medical examiner here in Nashville.

[Trial court's instructions to jury omitted]

[Prosecutor]:  In connection with your opinion as to the cause and manner of death of Stephanie Ward, your opinion is that she died as a result of some form of suffocation and that her manner of death is a homicide. What factors lead you to that conclusion as regards Stephanie Ward?

[Dr. Levy]:  There are many factors that we use to make that determination. Part of it was the lack of any findings from the autopsy, the lack of any findings from laboratory tests, the lack of any explanation for the child being found unresponsive. That had been investigated by Vanderbilt in the few days Stephanie had been at Vanderbilt between the time she was revived and the time she was declared brain dead. It was a review of Stephanie's clinical history and incidents in her prior clinical history and during her life. It was the review of the prior two deaths of Alexis Humphreys and Stephan Ward and the circumstances surrounding those deaths as well. All of that played a role in the determination of the cause and manner of Stephanie's death.

* * *

[Prosecutor]:  Did you consider sudden infant death as a possible diagnosis for Stephanie?

[Dr. Levy]:  No, we did not.

[Prosecutor]:  Why is that, Doctor?

[Dr. Levy]:  There were a couple of reasons. The major one being the deaths of the two prior children that had either been related to Stephanie or had been in the care of Ms. Ward at the time that they were found unresponsive or deceased. We had also gotten somewhat of a conflicting history about what had happened. At one point it wasn't clear whether she was found unresponsive or found, again, breathing funny or choking. And those sorts of things would, again, rule out the possibility of sudden infant death syndrome.

Then we had a child that was able to be revived and maintained in the hospital for several days. That is not seen

-24-

in a typical sudden infant death syndrome case. In those cases the children are not revivable.

Critical to the basis and foundation of each expert witness's conclusion as to the cause and manner of the death of Stephanie was the fact that three children had suffered otherwise unexplainable deaths while in the sole custody and care of Defendant. Dr. Levy disclaimed the "rule of three" as a mandatory rule, but essentially followed the "rule of three" in this case. Dr. Case was comfortable applying the "rule of three" even though the trial court prohibited her from specifically testifying about this medical principal. Therefore, the issue we must determine, as presented by Defendant, is whether the expert medical testimony of Drs. Case and Levy, concerning the death of Stephanie, was reliable when a primary and necessary basis for their conclusions was the fact that Defendant was the sole caregiver at the time of the otherwise unexplainable deaths of three children at different times and at different locations.

In *State v. Stevens*, 78 S.W.3d 817 (Tenn. 2002), the defendant argued on appeal that the trial court erred in excluding the expert testimony of a witness regarding crime scene analysis. The State's theory at trial was that defendant had hired an individual to kill the defendant's wife and mother-in-law, who were found dead in their home. The defendant's mother-in-law had been stabbed and manually strangulated, and his wife died as a result of ligature strangulation.

The expert witness proffered by the defendant was a former special agent for the FBI with twenty-five years of experience. He had taken several graduate courses in criminal justice, receiving a Master's Degree in Psychological Services. His last ten years with the FBI were served in the Behavioral Science Unit, investigating cases and doing research on violent criminal behavior. He had received basic and advanced training in criminal analysis, training in sex crimes investigation, and had become "an FBI expert" in this particular field of law enforcement. At the time of trial, he had retired from the FBI and was managing his consulting business in behavioral criminology. He had been hired by the defendant to conduct a criminal investigation of the crime scene. He reviewed crime scene photographs, the medical examiner's reports, the wife's diary, and a videotape of the crime scene. In order to provide an objective analysis, he was not given any information about the defendant. He concluded that the crime scene was a "disorganized sexual homicide scene." There was indication of post-mortem sexual activity, and a great deal of evidence was left at the crime scene. His proposed testimony was that, in his expert opinion, in a typical contract murder crime scene (which was the State's theory at trial), the offender spends little time at the crime scene, a firearm is the weapon of choice, and he acts quickly at the scene and is "out of there."

On cross-examination, the expert witness testified that the FBI had conducted a study to determine the accuracy of its crime scene analysis. It yielded a result of seventy-five to eighty percent accuracy rate. He further stated that in support of the reliability of his analysis, the FBI had increased the number of trained agents in the field from seven to forty. He acknowledged that crime scene analysis was not "hard science" where controlled experiments could be done. The trial court refused to admit any expert testimony indicating an interpretation of criminal behavior, including the expert's description of the characteristics of a typical contract murder crime scene. The trial

court reached this conclusion because the evidence did not comply with the requirement that the basis for the expert opinion be trustworthy or reliable. *Stevens*, 78 S.W.3d at 836.

The supreme court recognized that this was non-scientific expert testimony based upon experience rather than scientific evidence. *Id*. at 832. However, the supreme court concluded that the *McDaniel* factors should still be considered. *Id*. at 834. The Court held that the *McDaniel* factors "*may* apply, subject to the discretion of the trial court, 'as reasonable measures of the reliability' of all expert testimony described in [Tenn. R. Evid.] 702." *Id*. (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) (emphasis in original). The supreme court ultimately held that the behavioral crime scene analysis proffered by the defendant was inadmissible. *Id*. at 836. The supreme court held that when an expert's reliability is challenged, the trial court may consider these non-determinative factors: (1) the *McDaniel* factors, when they are reasonable measures of the reliability of expert testimony; (2) the expert's qualifications for testifying on the subject, and (3) the "straightforward connection between the expert's knowledge and the basis for the opinion such that no 'analytical debt' exists between the data and the opinion offered." *Id*. at 835. Even though the expert had testified that the FBI's study had shown a seventy-five to eighty percent accuracy rate for crime scene analysis, it lacked "sufficient trustworthiness to constitute evidence" of the technique's reliability. *Id*. at 836. The method for determining the rate of accuracy or error was not shown. *Id*.

Important to the analysis in the case *sub judice*, the supreme court in *Stevens* drew the following conclusion about the proposed testimony of the expert witness:

> Essentially, the jury is encouraged to conclude that because this crime scene has been identified by an expert to exhibit certain patterns or telltale clues consistent with previous sexual homicides triggered by "precipitating stressor," then it is more than likely that this crime was similarly motivated. *Cf. State v. Ballard*, 855 S.W.2d 557, 561 (Tenn. 1993) (rejecting as unreliable expert testimony concerning personality profiles of sexually abused children).

*Id*. at 835-36.

In *Ballard*, cited by the Court in *Stevens*, the supreme court concluded that expert testimony regarding the symptoms of post-traumatic stress syndrome exhibited by child abuse victims was inadmissible. The supreme court reasoned:

> In the context of the criminal trial, expert scientific testimony solicits the danger of undue prejudice or confusing the issues or misleading the jury because of its aura of special reliability and trustworthiness. This "special aura" of expert scientific testimony, especially testimony concerning personality profiles of sexually abused children, may lead a jury to abandon its responsibility as a fact finder and adopt the judgment of the expert. Such evidence carries strong potential to prejudice a defendant's cause by encouraging a jury to conclude that

because the children have been identified by an expert to exhibit behavior consistent with post-traumatic stress syndrome, brought on by sexual abuse, then it is more likely that the defendant committed the crime. Testimony that children exhibit symptoms or characteristics of post-traumatic stress syndrome should not suffice to confirm the fact of sexual abuse. The symptoms of the syndrome are 'not like a fingerprint – in that it can clearly identify the perpetrator of a crime.' Expert testimony of this type invades the province of the jury to decide on the credibility of witnesses.

*Ballard*, 855 S.W.2d at 561-62 (citations omitted).

Later, the Tennessee Supreme Court relied upon *Ballard* in the case of *State v. Coley*, 32 S.W.3d 831 (Tenn. 2000), when a majority of the Court held that "general and unparticularized expert testimony concerning eyewitness testimony, which is not specific to the witness whose testimony is in question, is inadmissible under Tenn. R. Evid. 702." *Id*. at 838. In *Coley*, wherein the defendant was convicted of aggravated robbery, the critical issue was identification of the defendant as the perpetrator. The defendant's proffered expert testimony covered the topics of the process of eyewitness identification, the relationship between stress and memory of an event, cross-racial identification, actual accuracy of an eyewitness identification, the confidence the eyewitness has in the accuracy of the identification, the effect of timely accuracy of memory, and the suggestibility of the photographic line-up used in the case which was the subject of the appeal. The question in *Coley* was whether the evidence of the expert witness was inadmissible because the testimony describing the *general reliability* of eyewitness testimony was not sufficiently reliable to substantially assist the jury as to whether the victims' testimony should be believed. While *Coley* depended substantially on the fact that the proposed expert testimony addressed a credibility determination rather than a "fact in issue," *id*. at 834, the supreme court's reliance upon the above quote from *Ballard* is instructive. The supreme court in *Coley* noted, as in *Ballard*, that the Court was dealing with expert testimony of a *general* nature designed to affect the jury's decision on the credibility of witnesses.

That portion of the testimony of Dr. Case and Dr. Levy which relied upon any variance of the "rule of three," i.e. the first unexplained child death in the presence of a sole caregiver can be classified as SIDS, with the second such death classified as undetermined, and the third and subsequent deaths result in all of the deaths being classified as homicides by asphyxiation, is, in essence, testimony of a general nature, even though the expert witnesses did not refer to that medical theory as the "rule of three" in their testimony.

Reviewing the five nonexclusive factors from *McDaniel*, we note that the testimony in this case indicated that the scientific evidence, by its very nature, could not be tested in an experimental manner, but was subject to some case studies. However, there was no testimony as to whether the case studies showed a potential rate of error. According to the record, the evidence has been subjected to peer review, with some experts disagreeing with the conclusion that the third of three unexplained deaths with a single caregiver changes each death from an undetermined cause of death

to homicide by asphyxiation. From the record, it is also evident that the evidence is accepted in the scientific community, though Dr. Levy said that the pure "rule of three" acceptance would be subject to a 50/50 split among experts. There is no indication in the record that the research in the field by the expert witnesses has not been conducted independent of litigation.

The trial court concluded that Dr. Case's "use and application of the 'rule of three' is not a proper foundation upon which to base her expert opinion testimony nor would it substantially assist the jury." From the entire context of the trial court's comments during the hearing, and from the entire context of the trial court's order, it is apparent that the trial court was referring to the scientific or medical labeling of a procedure as a "rule of three" and the acceptance of this as undisputable fact. However, we see no difference between the concept which is described as the "rule of three," and the labeling of that concept. In other words, if the "rule of three" is essentially a necessary basis for the experts' conclusions as to the cause and manner of death, and the "rule of three" is not a proper foundation upon which to base expert opinion testimony or will not substantially assist the jury, then the substance of the expert's testimony, no matter what the label is, is not a proper foundation for expert testimony.

The conclusion we reach on this issue is not a reflection at all upon the learned trial judge who presided over the pretrial hearing and the jury trial in this case. In this particular case of first impression, regarding proposed expert testimony based upon relatively new medical conclusions, the trial court allowed the parties great leeway to present proof and arguments, and performed a thorough analysis. We are cognizant that the trial court's ruling concerning the admissibility of expert testimony cannot be overturned absent a finding of abuse of discretion in admitting the expert testimony. *Stevens*, 78 S.W.3d at 832.

The trial court specifically found that the "use and application of the 'rule of three'" was not a proper foundation upon which to base expert opinion testimony. However, the trial court allowed the experts to use the facts, which constitute the "rule of three," to form a necessary and essential basis for their opinions that Stephanie's death was a homicide by asphyxiation. It is clear from the record that without the facts of three otherwise unexplainable deaths while in the sole care of Defendant, neither expert could form an opinion as to the cause and manner of death of Stephanie, regardless of what other evidence was reviewed by the experts. The trial court, in effect, allowed expert opinion testimony based upon an unreliable and improper foundation that did not substantially assist the jury in determining a material issue. Therefore, the discretion afforded the trial court was misapplied. *See Stevens* at 832. In reaching our conclusion in this issue, we place significance upon the following statement of the supreme court in *McDaniel*:

> We recognize that the burden placed on trial courts to analyze and to screen novel scientific evidence is a significant one. No framework exists that provides for simple and practical application in every case, the complexity and diversity of potential scientific evidence is simply too vast for the application of a single test.

*McDaniel* at 265.

The Defendant is entitled to relief on this issue. The trial court committed reversible error in admitting the expert opinion testimony of Dr. Case and Dr. Levy. The trial court found in its order, that the "rule of three" is not a proper foundation on which to base expert opinion testimony, nor would it substantially assist the jury. Nevertheless, the experts essentially based their opinions as to the cause and manner of death of Stephanie on the "rule of three," even though the moniker of "rule of three" was not allowed to be presented to the jury. The significance of the testimony of Dr. Case and Dr. Levy was such that we cannot conclude that this error was harmless error. Defendant is entitled to a new trial. However, in the event of further review and/or for the benefit of the trial court and parties upon retrial, we will address the remaining issues in this appeal.

### B.     Evidence of Other Crimes, Wrongs, or Acts

Defendant contends that evidence of the deaths of Stephen Ward and Alexis Humphreys was improper propensity evidence of other crimes, wrongs or acts in violation of Tennessee Rule of Evidence 404(b).

We have already concluded that expert testimony based upon the deaths of the other two children, as a foundation for the experts' opinions as to the cause and manner of Stephanie's death, was improperly admitted at trial. We will review the trial court's order as it pertains to lay testimony regarding the deaths of Stephen and Alexis.

Generally, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes." Tenn. R. Evid. 404(b). Issues to which evidence of other crimes, wrongs, or bad acts may be relevant include identity, motive, common scheme or plan, intent, or the rebuttal of accident or mistake defenses. *State v. Hall*, 958 S.W.2d 679, 707 (Tenn. 1997).

In its order addressing the issue, the trial court found that evidence of the unexplained deaths of Stephen and Alexis while in Defendant's care was relevant to the issue of intent because Defendant's intent is a required element of the indicted offense of first degree murder. *See* Tenn. Code Ann. §39-13-202(a)(1) (1997). The trial court determined, however, that the danger of unfair prejudice outweighed the probative value. *See* Tenn. R. Evid. 404(b)(3). We agree with this conclusion by the trial court. We are unable to foresee what evidence will be offered by either party at a retrial, and therefore, we decline to give in effect an advisory opinion as to what circumstances, if any, the probative value would not be outweighed by the prejudicial effect.

### C.     Evidence of Prior Medical Treatment

Defendant contends that the trial court erred by allowing Drs. Case and Levy to testify that prior attempts to seek medical treatment may indicate intentional asphyxiation by the caretaker. The State argues that the testimony was relevant to their medical opinions.

Defendant filed a pretrial motion to suppress this testimony. At the pre-trial hearing, Dr. Levy testified that Stephen had been seen by doctors at Vanderbilt Medical Center in the month preceding his death. He had allegedly choked on a penny. Dr. Levy testified about the significance of this medical history:

> What you find in cases where children are asphyxiated is you frequently will see previous episodes where children have been asphyxiated to some point and then brought to medical attention, so you see these previous what people will sometimes call life-threatening events; children coming to the hospital with reports of choking or abnormal breathing, who, after being checked up in the hospital, appear to be okay. It appears to be some kind of transient or temporary event which then all of a sudden either repeats itself or repeats itself with the presentation of a dead child.

Dr. Levy testified that he had seen such cases in his own experience and that they were well-documented in medical literature. Dr. Levy testified that Stephanie's emergency room records, which he had not reviewed prior to making the autopsy findings, revealed that on two occasions Defendant took Stephanie to the hospital, complaining that she was "breathing funny."

In its order regarding the admissibility of the expert testimony, the trial court did not address the admissibility of this testimony. At a hearing to address several pretrial motions filed by Defendant, the trial court emphasized that if Drs. Case or Levy *relied* upon certain information in forming their opinions, then the court would allow them to testify as to that information.

At trial, Dr. Case testified that Stephanie's medical history revealed that she had received emergency medical care on two separate occasions related to breathing difficulties. Defendant had called 911 on both occasions. When examined by doctors, Stephanie appeared to be normal. Dr. Case testified that the significance of those two instances was that children who die of asphyxiation commonly have histories of prior claims by the caretaker of difficulty in breathing. She testified that these occurrences are well-documented in medical literature. Dr. Case testified that these occurrences do not *explain* Stephanie's death however. She stated, "I don't know that we ascribe anything to them other than that the same person has made the claim that there is something causing them to not be breathing. In some cases that same person did something that interfered with the breathing."

Dr. Levy testified that knowledge of Defendant's prior attempts to seek medical treatment for Stephanie was important in forming his opinion as to Stephanie's cause and manner of death. Regarding those two incidents, Dr. Levy testified:

> Well, they are very important because what we know is that in many cases where children have been asphyxiated or have been abused by parents, there are prior visits for what's referred to in the medical community as acute life threatening

-30-

events. And those are things that we tend to see in cases where there have been deaths of children that are caused by other people.

Dr. Levy further testified that such cases typically result in asphyxial trauma, but "there are always exceptions to the rule."

Defendant argues in this appeal that this testimony invaded the province of the jury and is unreliable under the standards of *McDaniel v. CSX Transportation, Inc.*, 955 S.W.2d 257, 265 (1997). We agree. Although both experts testified that the cases they described were well-documented in medical literature, and Dr. Levy testified that he had seen such cases in his own experience, we cannot distinguish this expert testimony from that which the supreme court held to be inadmissible in *State v. Stevens*, 78 S.W.3d 817 (Tenn. 2002). We conclude that testimony that prior medical treatment is indicative of child abuse or asphyxiation caused by the caretaker is not a reliable basis upon which to form an expert opinion. Therefore, such testimony should not have been admitted.

Moreover, the record indicates that neither Dr. Case nor Dr. Levy relied on that information in forming their expert opinions. The trial court apparently admitted the testimony as a basis for the expert's opinions under Tennessee Rule of Evidence 703. Although Dr. Levy testified at trial that the fact that Stephanie had received prior medical treatment for breathing difficulty was important in forming his opinion as to her cause of death, he testified at the pretrial hearing that he did not have that information at the time he and Dr. Ward made their findings that Stephanie died as a result of homicide by smothering. Dr. Case testified that Stephanie's prior emergency medical treatment did not explain her cause of death. We therefore conclude that this evidence should not have been admitted.

### D.     Evidence of Other Living Children

Defendant also contends that evidence that she has other living children should not have been admitted. The State argues that this evidence was introduced for the limited purpose of establishing that Stephanie did not die from natural causes.

At trial, Dr. Case testified on direct examination as follows:

[Prosecutor]:          Doctor, are you aware of whether or not Ms. Ward had any other children?

[Dr. Case]:            Yes, I'm aware.

[Prosecutor]:          And are you aware of the fact that she has two living children?

[Dr. Case]:            I am aware, yes.

| [Prosecutor]: | Does that factor into the determination of whether or not there is a subtle genetic defect or a metabolic disorder or a congenital anomaly that might cause the death of Stephanie Ward? |
|---|---|
| [Dr. Case]: | Those two children mentioned are healthy and have lived for several years. That is additional information that demonstrates that she, as the mother, did not pass on to her two other children that died any kind of congenital anomaly or genetic or metabolic problem. |

Dr. Case further testified on redirect examination:

| [Prosecutor]: | Is there any other information besides that workup at Vanderbilt that rules out or makes it much less likely that Ms. Ward had some genetic defect or disorder that she could have passed on to her children? |
|---|---|
| [Dr. Case]: | There is. |
| [Prosecutor]: | What's that? |
| [Dr. Case]: | And that is that back at the time that we made a ruling as to this death there was a child of Ms. Ward's that was living who is now, I believe, four years of age. And there has subsequently been a second child, both or whom are healthy and doing well as far as I'm aware. |

Defendant cites *State v. Coley*, 32 S.W.3d 831 (Tenn. 2000), and argues that this testimony invaded the province of the jury. We disagree. Unlike the expert testimony at issue in *Coley*, this testimony concerned a "fact in issue," whether or not Stephanie died of natural causes. *See id.* at 834; Tenn. R. Evid. 401, 702. It was not error for the trial court to admit this testimony. Defendant is not entitled to relief on this issue.

**Statistical Probability Testimony**

Next, Defendant contends that the trial court erred in ruling that expert testimony concerning the improbability of three child deaths under the supervision of the same caretaker would be admissible to rebut Defendant's claim of accident or mistake.

Defendant filed a pretrial motion to suppress the testimony of Dr. Robert Hauser. The proffered testimony, in the form of a letter from Dr. Hauser to the Assistant District Attorney General, was admitted as an exhibit at the pretrial hearing. Considering the facts and circumstances

of each of the three children's deaths, Dr. Hauser concluded, based on the number of African-American households in Davidson County, Tennessee, that the probability of three SIDS deaths occurring in the same household is very low.

The trial court concluded that the proffered testimony met the admissibility standards for expert testimony. The court recognized that sources from which Dr. Hauser derived the data used to calculate the statistical probabilities were generally accepted scientific data. *See McDaniel* at 265. Additionally, the court found that the evidence would "substantially assist" the jury in determining a fact in issue, and that the "expert testimony was necessary to help jurors understand testimony related to the causes of death for the three alleged victims in that it is being offered to exclude certain other causes of death." *See* Tenn. R. Evid. 702. The court found, however, that the probative value of Dr. Hauser's opinion testimony was substantially outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 403(b)(3).

The trial court compared this case to *State v. Pankow*, 422 N.W.2d 913 (Wis. 1988), in which the Wisconsin Court of Appeals upheld the trial court's admission of Dr. Hauser's opinion testimony. In *Pankow*, two children died while in the defendant's care within a period of two years. Their deaths were determined to be SIDS. A third child died subsequently, and all three deaths were subsequently determined to have been caused by asphyxiation. Based on the facts and circumstances of that particular case and certain generally accepted data: that two SIDS deaths occur per 1,000 live births; 90% of SIDS deaths occur under six months of age; and 90% of SIDS deaths occur between midnight and 9 a.m., Dr. Hauser gave the statistical probability of three infants dying of SIDS in the same household during a five-year period. Such an event would occur by chance every 600,000 years. The appellate court stated, "the statistical evidence did not assign a cause to the deaths. It simply sought to eliminate SIDS as a cause. . . . Accordingly, we do not consider that the evidence improperly invaded the province of the jury with an opinion of guilt or improperly attempted to quantify the reasonable doubt standard." *Id.* at 918 (citations omitted).

The trial court distinguished this case from *Pankow*. Unlike the defendant in that case, Defendant in this case had not yet raised the defense of accident or mistake. The trial court determined that Dr. Hauser's testimony, although relevant, would be substantially more prejudicial than probative unless introduced to rebut Defendant's claim of accident or mistake. *See* Tenn. R. Evid. 403. The trial court ruled that the testimony would not be admissible in the State's case-in-chief, but it would be admissible to rebut a claim by Defendant that Stephanie's death was an accident or mistake.

We agree in part with the trial court's ruling. Evidence regarding statistical probabilities is outside the common understanding of the jury. *See* Tenn. R. Evid. 702; *Coley*, 32 S.W.3d at 833-34. Furthermore, the facts and data underlying the expert opinion are trustworthy. *McDaniel v. CSX*, 955 S.W.2d at 265. Dr. Hauser relied on mortality data maintained by the University of Tennessee and the Tennessee Department of Health and population data derived from the U.S. Census. The proffered testimony is also relevant and would aid the jury in determining a fact in issue, the deceased's cause of death. *See* Tenn. R. Evid. 401, 402, 702. The trial court concluded that the

danger of unfair prejudice would substantially outweigh the probative value of such evidence, and properly excluded the testimony from the State's case-in-chief. The trial court ruled, however, that the testimony would be relevant to rebut a claim of accident or mistake. We disagree. Dr. Hauser assessed the probability of multiple SIDS deaths while in the care of the same individual. A claim of accident or mistake by Defendant at trial could consist of assertions that Stephanie died of a cause other than SIDS. We therefore conclude that Dr. Hauser's testimony would be relevant only to rebut a claim by Defendant that Stephanie's death was the result of SIDS.

**Defense Counsel's Inability to Meet With Dr. Case**

Defendant also argues that the trial court erred by allowing Dr. Case to testify because defense counsel was unable to meet with her prior to trial. The State argues that defense counsel reasonably knew the sum and substance of Dr. Case's proposed testimony from her testimony during the pre-trial hearings. The State argues that defense counsel had ample opportunity to meaningfully cross-examine Dr. Case at the pretrial hearings. The record on appeal contains four volumes of transcript from those hearings. As the State points out in its brief, Dr. Case's pretrial testimony consisted of almost one hundred pages of transcript.

During a pretrial hearing on April 19, 2002, the trial court instructed defense counsel to contact Dr. Case and Dr. Levy to discover what facts the doctors specifically relied upon in forming their expert opinions. On May 3, 2002, Defendant filed a motion to exclude the testimony of Dr. Case, alleging that Dr. Case had "failed to make herself available to answer defense counsel's questions prior to trial." Defense counsel alleged that she contacted Dr. Case, but Dr. Case advised defense counsel that she would not be prepared to answer any questions regarding her testimony until she arrived on the eve of trial. On May 6, 2002, the first day of the trial in this case, defense counsel explained to the trial court that she had called Dr. Case's office and was informed that Dr. Case would be out of the office until later that week. When defense counsel finally spoke to Dr. Case, Dr. Case advised that she would not be prepared to speak to defense counsel about the case until she arrived for trial because she had not had an opportunity to review the materials in the case since giving her testimony at the pretrial hearing. Defense counsel asked Dr. Case what facts and circumstances she relied upon in forming her opinion as to Stephanie's cause and manner of death, and Dr. Case declined to answer.

From our review of the record, we perceive Dr. Case's failure to respond to defense counsel's attempts to interview Dr. Case and her refusal to answer defense counsel's questions as inappropriate and her failure to cooperate with defense counsel as more than a mere inconvenience. At the conclusion of a pretrial hearing on the issue of whether to exclude certain expert testimony, the trial court emphasized that it would admit testimony that formed the basis of the experts' opinions. Therefore, it was critical to Defendant's case to ascertain the facts and circumstances that were the basis of Dr. Case's expert opinion.

We conclude, however, that Defendant was not prejudiced by her inability to interview Dr. Case prior to trial. Defense counsel was given the opportunity to interview the witness before she

took the stand. The trial court allowed defense counsel an adequate opportunity to question Dr. Case in the absence of the jury prior to the start of trial. The trial court thus took appropriate steps to insure that Defendant suffered no prejudice as a result of defense counsel's inability to meet with Dr. Case to discuss her testimony in the days prior to trial. Furthermore, Defendant has not established what, if anything, could have been gained by an interview with Dr. Case prior to trial that was not revealed during the pre-trial hearing or during defense counsel's questioning of Dr. Case outside the presence of the jury. Defendant has not established prejudice, and therefore, Defendant is not entitled to relief on this issue.

## Cumulative Evidence

Defendant also argues that the testimony of Dr. Levy was redundant, repetitive, and cumulative.

Defendant filed a motion to exclude the testimony of either Dr. Case or Dr. Levy. Defendant argued that testimony from both experts would constitute a "needless presentation of cumulative evidence." *See* Tenn. R. Evid. 403. At the conclusion of a pretrial hearing at which Dr. Case and Dr. Levy both testified, the trial court stated, "I think [the] testimony [of Drs. Case and Levy] is sufficiently different. Now I realize, of course, I may kind of, depending after one testifies, if it gets too cumulative, clearly I will step in and cut that off. . . ."

Tennessee Rule of Evidence 403 requires exclusion of evidence, even when relevant, if the "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." We agree with the trial court's assessment that the testimony of both experts was sufficiently different. Moreover, allowing both experts to testify did not undermine judicial economy. The trial court did not clearly abuse its discretion in allowing both experts to testify. *See State v. Harris*, 30 S.W.3d 345, 350 (Tenn. Crim. App. 1999). Defendant is not entitled to relief on this issue.

## Closing Argument

Defendant argues that the trial court erred by denying Defendant's request for a mistrial based on the State's closing argument. Defendant argues that the prosecutor improperly implied that Defendant killed all three children and improperly commented on Defendant's credibility.

The State argues in its brief that defense counsel failed to make a contemporaneous objection to the prosecutor's statements, and therefore the issue is waived. *See* Tenn. R. App. P. 36(a). After the close of all the proof, and prior to closing arguments, however, the trial court cautioned the prosecutor that "the deaths of [Stephen and Alexis] only came in for the very, very limited purpose of what the medical examiner said and for nothing else, and your argument needs to comport with that." The court then stated to defense counsel, "if that were to be the argument, you don't even need

to worry about objecting to that. I understand your objection, and I'll take care of it." We therefore conclude that the issue is not waived.

Attorneys are generally given wide latitude in the scope of their arguments. *State v. Bigbee*, 885 S.W.2d 797, 809 (Tenn. 1994). Consequently, a trial court is accorded wide discretion in its control of the closing arguments. *State v. Zirkle*, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). We will not interfere with that discretion in the absence of abuse. *Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975). To show error, a defendant must show that the argument was so inflammatory or the conduct so improper that it affected the verdict to the defendant's detriment. *Zirkle*, 910 S.W.2d at 888. In *Judge v. State*, this Court listed five factors that should be considered in making the determination of whether the improper conduct could have affected the verdict in a way that prejudiced the defendant:

> (1) The conduct complained of, viewed in light of the facts and circumstances of the case.
>
> (2) The curative measures undertaken by the court and the prosecutor.
>
> (3) The intent of the prosecutor in making the improper statement.
>
> (4) The cumulative effect of the improper conduct and any other errors in the record.
>
> (5) The relative strength or weakness of the case.

539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

Defendant complains about the following statements made by the prosecutor during closing argument:

> Is it just a coincidence, ladies and gentlemen, that all three of these children who the doctors testified had exactly the same findings? Now, counsel wants to suggest to you that those deaths of Alexis and Stephen are unexplained. That's not what the doctors testified to. What they said was there was no anatomical, no medical finding for their cause of death. That's different than unexplained.

The prosecutor also commented on the inconsistent statements of Defendant regarding Alexis' and Stephanie's deaths, stating, "that story is as different as night and day. They can't both be true. Therefore, the defendant is lying." The prosecutor also argued:

> And I would submit to you that when a person does lie, when they try and point the finger at somebody else, three of those fingers are pointing back at them. . . . You need to place your reliance as well on the testimony of these doctors because

their medical certainty is the moral certainty that you must look to in determining this. **We have three kids, folks, within a period of two years dying at the hands of this caretaker**.

(Emphasis added).

Defense counsel objected to that comment, and the trial court admonished the jury to disregard the last comment and to consider the testimony regarding Alexis and Stephen "only as it relates to Dr. Levy's and Dr. Case's opinion."

Additionally, Defendant complains that the prosecutor improperly commented on Defendant's decision not to testify. The prosecutor remarked:

> There's only one person, one person, that could have possibly offered up a history of accidental suffocation, and that was the defendant. She had that opportunity on three separate occasions when she spoke with Detective Carter, medical personnel and other individuals to offer that explanation. She offered no explanation that would suggest accidental suffocation.

We conclude that the prosecutor's statement that all three children died "at the hands of this caretaker" was an improper comment on the evidence admitted at trial. This remark was directly contrary to the trial court's instruction to the prosecutor that he not comment on the deaths of Stephen and Alexis except as they pertain to the experts' testimony. The trial court took curative measures, however, and we conclude that the improper comment does not require reversal. We also conclude that the prosecutor's remark that Defendant did not "offer[] up a history of accidental suffocation" was not an improper comment on Defendant's decision not to testify. In context of the prosecutor's closing argument, this remark was not a misstatement of the evidence. The proof at trial showed that Defendant did not give an explanation for Stephanie's death, accidental or otherwise, to the paramedics who transported Stephanie to Vanderbilt Medical Center, the social worker who interviewed Defendant at the hospital, or Detective Carter, who took statements from Defendant on two separate occasions. The inappropriate comments were not so inflammatory that they affected the verdict of the jury to Defendant's detriment. *See Zirkle*, 910 S.W.2d at 888.

**Sufficiency of the Evidence**

Defendant contends that the State failed to prove beyond a reasonable doubt that Defendant was guilty of second degree murder.

When a defendant challenges the sufficiency of the convicting evidence, this Court must review the record to determine whether the evidence at trial was sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt predicated upon direct evidence, circumstantial evidence or a

combination of direct and circumstantial evidence. *State v. Brewer*, 932 S.W.2d 1,18 (Tenn. Crim. App. 1996).

Circumstantial evidence alone may be sufficient to support a conviction. *State v. Tharpe*, 726 S.W.2d 896, 899-900 (Tenn. 1987); *State v. Gregory*, 862 S.W.2d 574, 577 (Tenn. Crim. App. 1993). If a conviction is based purely on circumstantial evidence, however, the evidence must exclude every other reasonable theory or hypothesis other than guilt. *Tharpe*, 726 S.W.2d at 900. The jury decides the weight to be given to circumstantial evidence. "The inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions. . . for the jury." *Marable v. State*, 203 Tenn. 440, 313 S.W.2d 451, 457 (Tenn. 1958) (citations omitted); *see also State v. Gregory*, 862 S.W.2d 574, 577 (Tenn. Crim. App. 1993).

On appeal, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). This Court does not reweigh or reevaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). A jury verdict, once approved by the trial judge, accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994). Accordingly, the state is entitled to the strongest legitimate view of the evidence and all legitimate and reasonable inferences which may be drawn therefrom. *Id*. We must consider all evidence submitted at trial, and we may not limit the analysis to only the evidence that is determined upon review to be admissible. *State v. Longstreet*, 619 S.W.2d 97, 100-01 (Tenn. 1981); *State v. Alley*, 968 S.W.2d 314, 316 (Tenn. Crim. App. 1997).

The trier of fact, not this Court, resolves questions concerning the credibility of the witnesses, the weight and value to be given the evidence as well as all factual issues raised by the evidence. *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). In *State v. Grace*, the Tennessee Supreme Court stated, "[a] guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." 493 S.W.2d 474, 476 (Tenn. 1973). Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of demonstrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982); *Grace*, 493 S.W.2d at 476.

A conviction for second degree murder requires proof beyond a reasonable doubt that Defendant knowingly killed another person. Tenn. Code Ann. § 39-13-210(a)(1) (1997). The proof in this case is entirely circumstantial. However, viewed in a light most favorable to the State, we conclude that the evidence, when the expert testimony of Dr. Case and Dr. Levy is considered, was sufficient to convict Defendant of second degree murder. As stated above, when reviewing the sufficiency of the evidence on appeal, we must consider all of the evidence admitted at trial, even if we have determined that a substantial and critical portion of that evidence was erroneously admitted at trial.

*Corpus Delicti*

Defendant argues that the State failed to prove the *corpus delicti*. Two elements make up the *corpus delicti* in a homicide case: (1) the death of a human being; and (2) criminal agency in producing that death. *State v. Shepherd*, 902 S.W.2d 895, 901 (Tenn. 1995). The State must prove those elements beyond a reasonable doubt. *Id.* In establishing the *corpus delicti*, the State may rely purely on circumstantial evidence. *Berry v. State*, 523 S.W.2d 371, 373-74 (Tenn. Crim. App. 1974). The evidence must show that the death was not self-inflicted, accident, or by natural causes. *Shepherd*, 902 S.W.2d at 901 (citing *Davis v. State*, 445 S.W.2d 933, 935 (Tenn. Crim. App. 1969)).

The State presented proof that the cause of Stephanie's death was asphyxiation by homicide. Dr. Levy testified that extensive tests were performed on Stephanie during the time that she was admitted to Vanderbilt Hospital. Those tests and the autopsy findings revealed no cause of death. The State eliminated accidental and natural causes of death and SIDS with the testimony of Drs. Case and Levy, who testified that the cause and manner of death was homicide by asphyxiation.

Defendant argues that the State failed to establish the criminal agency of the accused. Defendant argues that Rochelle Marsh was also present in the home on the morning that Stephanie stopped breathing, and Ms. Marsh did not witness any wrongdoing by Defendant. Ms. Marsh testified at trial that she saw Stephanie playing in her bedroom sometime early that morning. Later that morning, Defendant asked Ms. Marsh to watch Stephanie while Defendant left the apartment. Ms. Marsh fell asleep, and was awakened later by Defendant shouting for help. Detective Carter testified that Ms. Marsh gave consistent statements regarding the circumstances surrounding Stephanie's death. Detective Carter also testified that Defendant's statements were inconsistent, and Defendant did not state in her initial interview with Detective Carter that Ms. Marsh had gone into the room with Stephanie before Stephanie stopped breathing. In a subsequent interview, Defendant told Detective Carter that Ms. Marsh was in the bedroom with Stephanie while Defendant was in the bathroom.

The jury accredited the testimony of Ms. Marsh and Detective Carter and discredited Defendant through her statements to the police. In a light most favorable to the State, Defendant was alone with Stephanie immediately preceding her death, and Stephanie's death was not accidental. The evidence admitted at trial, including the erroneously admitted expert testimony, was sufficient to establish that Defendant knowingly killed Stephanie.

**Sentencing**

Defendant challenges the length of her sentence. A defendant's sentence is reviewed by the appellate courts *de novo* with a presumption that the determinations made by the trial court are

correct. Tenn. Code Ann. § 40-35-401(d); *State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002). For this presumption to apply to the trial court's actions, there must be an affirmative showing in the record that the trial court considered sentencing principles and all relevant facts and circumstances. *State v. Pettus*, 986 S.W.2d 540, 543-44 (Tenn. 1999). While determining or reviewing a sentence, the courts must consider:(1) the evidence received at trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence offered by the parties on the enhancement and mitigating factors; (6) any statement the defendant wishes to make in the defendant's behalf about sentencing; and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103(5), -210(b); *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991).

If the trial court has imposed a lawful sentence by following the statutory sentencing procedure, has given due consideration and proper weight to the factors and sentencing principles, and has made findings of fact adequately supported by the record, this Court may not modify the sentence even if it would have preferred a different result. *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). However, if the trial court does not comply with statutory sentencing provisions, our review of the sentence is *de novo* with no presumption the trial court's determinations were correct. *State v. Winfield*, 23 S.W.3d 279, 283 (Tenn. 2000).

At the conclusion of the sentencing hearing, the trial court sentenced Defendant as a Range I standard offender to twenty-five years, the maximum sentence allowable under the law. *See* Tenn. Code Ann. § 40-35-112(a)(1) (1997). The trial court applied enhancement factor (2), that Defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range. Tenn. Code Ann. § 40-35-114(2) (2003). The trial court noted that although Defendant had not been convicted for the deaths of Stephen Ward and Alexis Humphreys, the trial court determined by a preponderance of the evidence that Defendant was responsible for their deaths. The trial court also found the victim in this case to be particularly vulnerable because of her age and noted "[g]iven the extremely young age of this child, clearly she could not resist and certainly couldn't summon help or testify at a later date." *See* Tenn. Code Ann. § 40-35-114(5) (2003). The trial court also found that Defendant abused a position of public or private trust. *See* Tenn. Code Ann. § 40-35-114(16) (2003). In mitigation of the offense, the trial court found that Defendant assisted the authorities in locating or recovering any property or persons involved in the crime. *See* Tenn. Code Ann. § 40-35-113(10) (2003).

Defendant argues that the trial court erred in applying enhancement factor (2) because Defendant had not been convicted for the deaths of Stephen and Alexis at the time of sentencing. Citing *State v. Winfield*, 23 S.W.3d 279, 283 (Tenn. 2000), the State argues that the application of enhancement factors only requires proof by a preponderance of the evidence.

Defendant was indicted for the deaths of Stephen, Alexis, and Stephanie. The offenses were severed, and Defendant was tried and convicted for the death of Stephanie. The record does not indicate the disposition, if any, of the cases involving the deaths of the other two children. Defendant cites *State v. Buckmeir*, 902 S.W.2d 418 (Tenn. Crim. App. 1995), and argues that it is

improper for a trial court to consider pending criminal charges for enhancement purposes. *Id*. at 424. In *Buckmeir*, this Court held that evidence of pending charges, without more, was not enough to establish criminal activity. *Id*. This Court has recognized, however, that a trial judge may find evidence of criminal *behavior* even though there has been no conviction. *State v. Massey*, 757 S.W.2d 350, 352 (Tenn. Crim. App. 1988). A trial court may even apply an enhancement factor based on facts underlying an offense for which the defendant has been acquitted, so long as the facts have been established in the record by a preponderance of the evidence. *Winfield*, 23 S.W.3d at 283.

Neither the State nor Defendant presented any proof at the sentencing hearing. Based on the proof at trial, however, the trial court found by a preponderance of the evidence that Defendant was responsible for Stephen's and Alexis' deaths. The evidence admitted at trial, even though erroneously admitted, supports the trial court's determination. The proof at trial established that Stephen was sixteen months old at the time of his death. A child's death cannot be classified as SIDS when the child dies over the age of one year. The autopsies of Stephen and Alexis were "negative autopsies," meaning that no natural or accidental cause of death was determined. The preponderance of the evidence, through the expert testimony, showed that Stephen and Alexis were in the sole care of Defendant at the time of their deaths. We therefore conclude that the trial court's application of this enhancement factor was proper based on the trial court's finding by a preponderance of the evidence that Defendant killed the other two children.

Defendant argues that the trial court improperly applied enhancement factor (5). The trial court found that Stephanie's age clearly prevented her from resisting, summoning help, or testifying at a later date. In *State v. Poole*, 945 S.W.2d 93, 96 (Tenn. 1997), the supreme court held that proof of age alone is not sufficient to support the application of this enhancement factor. *Id*. at 98. In that case, the record contained no evidence that the 70-year-old victim was particularly vulnerable because of circumstances other than her age. In this case, the victim was six months old. Dr. Case testified at trial that a child of that age can be asphyxiated "easily because an adult has a greater strength and ability to do things that can cause them to die." Dr. Case testified that a child who is deprived of oxygen would struggle, but would lose consciousness after approximately sixty seconds. This proof in addition to Stephanie's very young age at the time of death, is sufficient to support application of this enhancement factor.

Defendant also argues that Defendant's sentence should have been mitigated by the following circumstances: (1) that Defendant sought medical treatment for Stephanie; (2) that Defendant "was distraught by her daughter's condition;" (3) that Defendant attempted to perform CPR on Stephanie. We conclude that those are not appropriate mitigating circumstances in light of the victim's age and the fact that Defendant was the victim's mother. We conclude that Defendant's sentence is proper.

**CONCLUSION**

For the reasons stated herein, we reverse Defendant's conviction and remand this case for a new trial.

_____
THOMAS T. WOODALL, JUDGE