# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT JACKSON
### November 13, 2013 Session

## STATE OF TENNESSEE v. TAWANA JONES

### Appeal from the Criminal Court for Shelby County
### No. 1104213    Lee V. Coffee, Judge

### No. W2013-00335-CCA-R3-CD  - Filed January 29, 2014

Appellant, Tawana Jones, was convicted by a Shelby County jury of rape and abuse of an adult. *See* Tenn. Code Ann. §§ 39-13-502(a)(3), 71-6-117. The trial court sentenced appellant to twelve years and two years, respectively, to be served consecutively. On appeal, appellant challenges: (1) the sufficiency of the evidence supporting her rape conviction regarding whether the victim was mentally defective and, if so, whether appellant knew the victim was mentally defective; (2) the sufficiency of the evidence supporting appellant's abuse of an adult conviction; (3) the trial court's use of specific enhancement factors during sentencing; and (4) the trial court's imposition of consecutive sentences. Following our review of the parties' arguments, the record, and the applicable law, we affirm appellant's rape conviction and, as the State concedes must be done, reverse and remand appellant's abuse of an adult conviction for proceedings consistent with this opinion.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part and Reversed in Part; Remanded in Part

ROGER A. PAGE, J., delivered the opinion of the Court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Mitchell W. Wood (on appeal and at trial) and Gerald Waggoner (at trial), Memphis, Tennessee, for the appellant, Tawana Jones.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Amy Weirich, District Attorney General; and Terre Fratesi and Greg Gilbert, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## I. Facts

This case concerns the rape and abuse of a thirty-three-year-old man who had an intellectual disability.[1] A Shelby County grand jury indicted appellant, the victim's state-provided caregiver, for rape according to Tennessee Code Annotated section 39-13-502(a)(3), alleging that appellant "intentionally [had] [the victim] sexually penetrate" her at a time that appellant knew or had reason to know that the victim was mentally defective. The grand jury also indicted appellant for abuse of an adult according to Tennessee Code Annotated section 71-6-117; however, the indictment does not state a factual basis for the charge.

### A. Trial

Dr. Tucker Johnson testified on behalf of the State. She stated that she was a full-time clinical psychologist with the Department of Intellectual and Developmental Disabilities ("DIDD") and that she had worked there for approximately five and one-half years. While Dr. Johnson did not personally evaluate the victim, she testified regarding her department's records involving the victim.

She stated that in March 2010, the victim became a recipient of Medicaid's Home and Community-Based Waiver Services, which is a state-funded program that provides

---

[1] As the Tennessee Supreme Court stated in *Coleman v. State*:

The terms "intellectual disability" and "mental retardation" refer to the same population in number, kind, type, and duration of disability. *See* President's Committee for People with Intellectual Disabilities, *A Charge We Have to Keep* 3 n.i (2004), http://www.acf.hhs. gov/programs/pcpid/docs/mr_2004_final.pdf. Robert L. Schalock et al., *The Renaming of Mental Retardation: Understanding the Change to the Term Intellectual Disabilities,* 45 Intellectual and Developmental Disabilities 116, 116 (2007). Thus, the terms are interchangeable, Tenn. Code Ann. § 33-1-101(16)(C)(Supp. 2010), and "intellectual disability" is the preferred term. Am. Ass'n on Intellectual and Developmental Disabilities, *Intellectual Disability: Definition, Classification, and Systems of Support* 3 (11th ed. 2010) ("AAIDD Manual").

341 S.W.3d 221, 226 (Tenn. 2011). Furthermore, the Tennessee State Legislature amended the statutory scheme in 2010 and replaced the term "mental retardation" with "intellectual disability." *See* 2010 Pub. Acts, ch. 734. Therefore, we will use the term "intellectual disability" throughout this opinion.

community-supported living homes for individuals with intellectual disabilities. To qualify for the program, an individual must complete an application and have one or more home visits conducted by an assigned case manager. These individuals must prove that their "intellectual and adaptive deficits" arose during their developmental period and that they are financially eligible for Medicaid. She testified that before individuals are considered intellectually disabled, they must satisfy three criteria: have significantly sub-average general intelligence, measured by IQ points; have deficits in adaptive functioning, which means the individuals have difficulties caring for themselves or communicating with others; and the deficits must have appeared before the age of eighteen.

Dr. Johnson testified regarding the victim's records concerning his intellectual disability. First, in reference to his general intelligence, Dr. Johnson stated that there are four categories of intellectual disability: mild, moderate, severe, and profound. She stated that when the victim entered the Home and Community-Based Waiver Services, the victim's IQ was fifty-five, which is classified as a "very low mild to high moderate" disability.

Regarding the victim's adaptive functioning, Dr. Johnson testified that the victim scored a fifty-five out of one hundred. This adaptive functioning score is determined in categories: motor skills, personal living skills, community living skills, and social and communication skills. The victim's motor skills were determined to be at the age equivalent of six years, eight months. His age equivalent for personal living skills was ten years. His age equivalent for community living, which is an individual's ability to interact and be independent within a community, was assessed to be five years, ten months. Finally, the victim's social and communication skills, which reflect his ability to express himself clearly, comprehend what other people are saying, and interpret social cues, were determined to be at the age equivalent of four years, one month. All of these scores were considered, and the victim was found to have an overall adaptive level of six years, eight months. Dr. Johnson stated that generally people with the victim's social and communication scores often have difficulty interpreting verbal and non-verbal behavior as well as difficulty expressing their needs and desires. Dr. Johnson stated these individuals frequently do not like conflict and will "passively go along with suggestions."

Lastly, the victim's records showed that he was intellectually disabled before the age of eighteen. The victim was delivered prematurely after an abbreviated gestational period of six months, which may have affected his brain development. Dr. Johnson testified that the victim's records showed that he was delayed in meeting developmental milestones like talking, walking, toilet training, and writing. The victim's records indicated that when he was fifteen years of age he had an IQ of forty-one, which is considered to be a moderate intellectual disability.

Dr. Johnson stated that after the victim was accepted into the program, he was put on an accelerated track for placement in a home because he had a history of being confined in locked mental health hospitals. The victim had received these services continually since March 2010.

Perry Adams was the State's next witness and testified that he worked in a private psychology practice. He stated that he had been performing psychological assessments since 1980. Mr. Adams had previously performed work for the Shelby County Schools, the Department of Veterans Affairs, "Social Security Disability determination," the Tennessee Department of Vocational Rehabilitation, and the Tennessee Department of Mental Retardation.[2] He stated that DIDD requires an expert to establish that a person is intellectually disabled before DIDD can provide services through Medicaid and that he performs contract work for the non-profit organization that provides the required evaluations. The trial court accepted Mr. Adams as an expert.

Mr. Adams performed a psychological assessment on the victim. After the assessment, Mr. Adams determined that the victim suffered from an intellectual disability. He determined that the victim had significant developmental delays after a very premature birth. He also considered the fact that the victim had participated in Special Educational Services in the Memphis City Schools throughout his education. Mr. Adams testified that he utilized the Wechsler Adult Intelligence Scale, which is an interactive IQ test, when evaluating the victim's IQ. He testified that the victim was "cooperative" and "[i]nterested in doing well." The victim scored a full scale assessment of fifty-five on the IQ scale. Mr. Adams stated that the victim would have "significant limitations" because his "basic cognitive functions are significantly behind other people his age." He also stated the victim's IQ would affect the victim's ability to "do things for himself," "get competitive employment," and "interpret everyday social activities and situations."

Mr. Adams also performed a Vineland Adaptive Behavior Scale test, which measures a person's adaptive behavior, by conducting a survey with the victim's mother, the person who best knew his history and development. He testified that this test assessed "things like making and keeping friendships, getting along with people, dressing, bathing, housekeeping, travel, [and] all the things that ordinary people do every day." Based on both the IQ test and the adaptive behavior test, Mr. Adams concluded that the victim suffered from a mild intellectual disability.

---

[2] The Tennessee Department of Intellectual and Developmental Disabilities was formerly known as the Tennessee Department of Mental Retardation.

On cross-examination, Mr. Adams stated that the victim could understand spoken language more than he could articulate language and express himself to others. Mr. Adams also stated that in modern psychology, experts use statistical scores like IQ and adaptive level scores rather than equate a person to a specific developmental age. He also conceded that the victim had previously been employed for one year as a dishwasher and that the victim was "competent in many simple domestic activities and skills but lazy in looking after his hygiene."

The victim testified next after the court determined that he was competent to testify. The victim stated that he was thirty-three years old and that his birthday was on February 15. However, he was unable to recall the name of the street on which he lived. He indicated that he enjoyed going to the park, dancing, and exercising. He stated that he enjoyed eating chicken, hot dogs, cheeseburgers, meatball spaghetti, corn, and peas. He also indicated that he enjoyed watching the news and "Law and Order," as well as listening to the radio. He stated that someone stayed at his home with him at all times. When asked what city he lived in, the victim responded, "Tennessee." He also stated that he could not drive a car. He indicated that he had attended school until age twenty-two.

In order to fully convey the victim's testimony regarding the date in question, part of his testimony is set out in full below:

Q.  [T]ell me --

A.  Uh-huh (affirmative response).

Q.  -- what room of your house something happened in?

A.  Okay. Well, we were in -- in the -- in the living room.

Q.  In the living room?

A.  You know, watching TV. She had told me something -- I had to turn my head around. She had told me something. Uh -- ooh, I hate this. Uh -- she was going to let me --

Q.  What did she say? What words did she say?

A.  That she want me eat down there (indicating).

Q.  Eat down there?

A.    Uh-huh (affirmative response).

Q.    And for the record, you're pointing. Where -- where are you pointing when you say "down there"? Can you show us?

A.    Well, she had pulled down -- her clothes down.

Q.    She pulled her clothes down?

A.    Yeah.

Q.    What else happened?

A.    She had came into my -- she had came into my room -- uh -- to get down on my knees. Uh -- she hold her legs wide open and I started doing it.

. . . .

Q.    -- did she ask you to put any part of your body to touch any part of her body?

A.    She was telling me to touch her body.

. . . .

Q.    What did you touch her with?

A.    With my tongue.

Q.    Did your tongue touch down there?

A.    Uh-huh (affirmative response).

Q.    Were her legs wide open?

A.    Yeah.

Q.    Did she ask you to do that?

A.    Yeah.

Q.    . . . [H]ow did that make you feel?

A.    Feel sad.

After the State introduced into evidence pictures of the victim's bedroom, the victim testified that when this act occurred, appellant was lying flat on the victim's bed with her hands behind her head. The victim testified that appellant removed her underwear and told him to touch her breasts and vagina with his mouth, which he did.

Suzanne Avery testified next that she was an Independent Support Coordinator for Neighborhood Network, an agency that contracts with the State to aid persons with developmental disabilities. She stated that she develops plans for those individuals so that they have "full days." She testified that the victim "can do some things for himself, but he has to be reminded every day to take a bath, to brush his teeth, [and] to put on clean clothes." She also stated that the victim enjoyed dancing, watching movies, and going to parks. She said that the victim wanted a job and that she was working with the Department of Rehabilitation Services to find him employment.

She also stated that the victim had to be supervised twenty-four hours a day by a caregiver because he had accidentally overdosed himself on medication previously and was unable to care for himself. She stated that he could not manage his own money, cook meals without supervision, read, or drive a car. Regarding communication with others, Ms. Avery explained that it was "hard for [the victim] to get what he's trying to say out, especially if he's nervous. He stutters a great deal. . . . He is hard to understand at times." She also stated that he did not have the ability to understand complex situations and complex relationships. Further, she stated that all DIDD providers must undergo training regarding abuse, neglect, and financial exploitation of the individuals under the workers' care.

Valerie Todd testified that she was the Program Administrator for Brenda Richardson Memorial Care Homes ("Brenda Richardson"). Ms. Todd aided the victim during his transition into the Brenda Richardson homes. She stated that the victim was a "level three," so he received one-to-one staff care twenty-four hours a day. Staff members aided the victim with his daily activities, such as cooking, administering his medications, making his doctors' appointments, and facilitating activities and outings. She also said that the victim could not "be alone in the community due to exploitation." She stated that the exploitation spanned "from financial to sexual to criminal." She asserted that the victim was "easily manipulated."

Ms. Todd testified that she learned of the incident at issue on March 8, 2011, when another caregiver for the victim asked her to speak to the victim. She stated:

> [The victim] looked scared, he looked sad. It wasn't his normal smile that I get when I see him and, you know, the normal greeting that I get from him. . . . He looked sad, he looked scared, and when I asked him what was wrong, he hesitated for a minute, and then he said, "She got me." And I'm like, "Who got you?" And he said, "Tawana." And then I asked what happened, and he proceeded to tell me what happened.

The victim told her that appellant "made him" perform oral sex. Ms. Todd stated that appellant began working for Brenda Richardson in November 2010. Ms. Todd testified that appellant successfully completed the DIDD's training for caregivers, which included training on the maltreatment of vulnerable adults.

Sergeant Roosevelt Twilley testified last for the State. Sergeant Twilley stated he had worked for the Memphis Police Department for twenty-three years and had been assigned to the Memphis Police Sex Crimes Bureau for approximately two years. On March 9, 2011, this case was assigned to Sergeant Twilley. He interviewed the victim and described their conversation as "a challenge."

Sergeant Twilley also interviewed appellant after informing her of her constitutional rights. During the interview, after earlier denying the victim's allegations, appellant admitted that she allowed the victim to perform oral sex on her person. Sergeant Twilley typed the confession, which appellant reviewed and signed. In her confession, appellant admitted that she was a caregiver working for Brenda Richardson. Appellant admitted to speaking about sexual activities around the victim. She stated that in January 2011,[3] she asked the victim if he had previously performed oral sex, and he indicated that he had. She inquired whether he would like to perform oral sex on her. She stated, "So I went in his room and took my clothes off and let him put his tongue on my [vagina]." Appellant also stated that in February 2011, she had engaged in sexual activity with another man in the victim's bedroom.

On cross-examination, Sergeant Twilley testified that when he interviewed the victim, the victim stated that the incident occurred on March 5, 2011, and that the appellant told him not to tell anyone that the incident occurred. He stated that he had difficulty understanding the victim due to his speech impediment but that the victim was able to answer his questions.

---

[3] Appellant did not explicitly testify that the events occurred in 2011, but the date is clear from the context.

He also stated that he received information indicating that the victim had been diagnosed with an intellectual disability.

On re-direct examination, Sergeant Twilley stated that during his interview, the victim said that appellant wanted him to be her man. The victim also indicated that appellant "would walk around with just her underwear on around him."

Following the close of proof and deliberations, the jury found appellant guilty of rape and abuse of an adult.

## B. Sentencing Hearing

At the sentencing hearing, the presentence report was admitted into evidence. The State again presented the testimony of Suzanne Avery, the victim's independent support coordinator. She had been employed by Neighborhood Network, working with people with mental or intellectual disabilities, for approximately ten years. Ms. Avery stated that there were clear standards for training caregivers of people with such disabilities. One of those standards addresses "protection from harm," which encompasses recognizing abuse and neglect, as well as abstaining from committing abuse or neglect.

Ms. Avery noted that it could be difficult to care for an adult with special needs because they are "childlike;" they "can't process thoughts" quickly and "can't understand things" as someone without such a diagnosis could. She opined that they could be easily exploited. Specifically, the victim had a behavioral plan in place on which everyone who worked with him was trained. The plan addressed how to redirect him in varying situations. In addition, each caregiver had the telephone numbers of several people whom they could call for assistance if they encountered a situation that they did not know how to address.

Ms. Avery testified that she had spoken with the victim and his behavioral analyst after the trial concluded. The victim had become "a little more touchy and want[ed] to hug a little more than usual." Caregivers had to "redirect him on appropriate ways to greet people." The victim had also attempted to discuss the incident with Andrea Holmes, his behavioral analyst. Ms. Avery noted that if the victim's behavior persisted, he would have to resume counseling sessions. He had previously received counseling immediately following the incident, but the sessions ceased when he stopped talking about the incident. The victim remained confused about his relationship with appellant. Ms. Avery stated that the incident in this case had negatively impacted the professional community involving independent living assistance to those with mental and intellectual disabilities.

The State also presented Valerie Todd, the program administrator for Brenda Richardson, as a witness. She stated that in conjunction with Ms. Holmes, she had decided not to have the victim attend the sentencing hearing because following the trial, it took approximately two weeks for the victim to stop discussing the incident. He had become preoccupied with the events. Because of this "spike" in the victim's fixation on the incident, they made a referral for him to obtain additional counseling.

Ms. Todd recalled that before the incident, the victim "was just eager, he was excited, he was just getting into the programs, and he was just finding his way and discovering new things." She further described the victim as having been "bubbly and happy." Following the incident, the staff had to undergo additional training to deal with his "wanting to hug, . . . inappropriate touching, [and] inappropriate conversation." The victim also developed outbursts of anger when the staff did not give him the desired attention. He slept more than usual during the day and refused to begin his activities at the appointed times during the days and weeks following the incident. Between the time of the incident and the time the trial began, caregivers had worked with the victim to correct these behaviors through four or five months of one-on-one counseling, retraining of the staff, and increasing the presence of management in the house. The program had also modified its operating procedure to include monthly "surprise" overnight visits rather than quarterly planned overnight visits. Many of the employees were paid hourly, which increased the costs to operate the program.

Ms. Todd explained that this incident impacted her work in that they depended on the direct care support professionals as the "backbone" of the system. Professionals in appellant's position were entrusted with implementing the plans that the rest of the team created. Since the incident with the victim in this case, she questioned "everything a little bit more." When an individual complained that they did not like a staff member, such a complaint "[took] [her] to a totally different level than before because [she] [didn't] want to overlook anything."

The trial court sentenced appellant to twelve years for her rape conviction and two years for her abuse of an adult conviction, to be served consecutively.

## II. Analysis

Appellant argues that the evidence presented at trial was insufficient to support the State's contention that she knew or should have known that the victim was mentally defective and that the evidence was also insufficient to support her conviction for abuse of an adult. In addition, appellant challenges the sentences she received, arguing that the trial court improperly enhanced her sentences to maximum lengths within her range and that the trial court erroneously imposed consecutive sentences. The State argues that there was sufficient

evidence to support appellant's rape conviction, which required the State to prove that the victim was mentally defective. The State has conceded that appellant's abuse of an adult conviction should be remanded for a new trial. Furthermore, the State argues that the trial court properly sentenced appellant to twelve years for the rape conviction.

## A. Sufficiency of the Evidence

### 1. Rape

Appellant contends that there was no direct evidence that the victim was mentally defective or that she knew or should have known the victim was mentally defective as is required for a conviction for rape. The State responds that the evidence was sufficient to sustain appellant's conviction. We agree with the State.

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate

level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

Count one of the indictment, which charged rape based on the mental status of the victim, alleged that appellant:

> [B]etween January 1, 2011[,] and March 8, 2011[,] in Shelby County, Tennessee, and before the finding of this indictment, did unlawfully and intentionally have [the victim] sexually penetrate [appellant] knowing or having reason to know that the [victim] was mentally defective, mentally incapacitated or physically helpless, in violation of T.C.A. 39-13-503, against the peace and dignity of the State of Tennessee.

To sustain a conviction for rape pursuant to the indictment, the State had to prove beyond a reasonable doubt that appellant intentionally had the victim sexually penetrate her when appellant knew or should have known that the victim was mentally defective. Tenn. Code Ann. § 39-13-503(a)(3). "Mentally defective" describes a person who "suffers from a mental disease or defect which renders that person temporarily or permanently incapable of appraising the nature of the person's conduct." Tenn. Code Ann. § 39-13-501(3).

In appellant's brief, appellant argues that proof of an intellectual disability is not sufficient to prove that the victim was mentally defective. Appellant expounded on this proposition, arguing that the State needed a witness to testify that the victim was "incapable of appraising the nature of his or her conduct" or that the victim is "mentally defective." *See* Tenn. Code Ann. § 39-13-501(3). Appellant also asserts that according to *State v. Schaller*, this witness should be an expert. *State v. Schaller*, 975 S.W.2d 313, 313 (Tenn. Crim. App. 1997). Finally, appellant argues that even if the State presented adequate proof that the victim was mentally defective, the State failed to prove that appellant knew or should have known that the victim was mentally defective.

Appellant relies on *State v. Schaller* to support her contention that the State failed to prove that the victim was mentally defective and that there was, therefore, insufficient evidence to support her rape conviction. However, the facts and circumstances in *Schaller* are distinguishable from the present case. In *Schaller*, the appellant was convicted of aggravated sexual battery against a thirteen-year-old girl, who the state alleged was mentally defective. *Schaller*, 975 S.W.2d at 313. The only evidence presented by the State to prove that the victim was mentally defective was a detective's testimony that the victim "appeared to be 'mentally challenged'" and a therapeutic foster care program counselor for the victim

who testified that the victim was in therapeutic foster care because the victim was mentally challenged and sexually abused. *Id.* at 315-16. The therapeutic foster care program counselor also stated that the victim was seeing a psychiatrist and was enrolled in a special education program. *Id.* at 316.

In *Schaller*, this court determined that there was insufficient evidence to prove that the victim was mentally defective. *Id.* at 313. The court noted that the victim was found competent to testify and could describe her attempts to get the appellant to stop. *Id.* at 318. The court also stated that it viewed "the testimony that [the victim] was 'mentally challenged' to be an ambiguous, euphemistic reference that is not helpful" in determining whether the victim was mentally defective. *Id.* at 317. Finally, the court noted that proof that someone is mentally defective "should ordinarily come from a psychologist, psychiatrist, or other expert medical personnel." *Id.* at 318.

Appellant asserts that *Schaller* requires an expert to state that the victim is "incapable of appraising the nature of his or her conduct" or that the victim is "mentally defective." *See* Tenn. Code Ann. § 39-13-501(3). We disagree. *Schaller* states that "proof that meets the *statutory definition* of mentally defective should *ordinarily* come from a psychologist, psychiatrist, or other expert medical personnel." *Schaller*, 975 S.W.2d at 318 (emphasis added). It does not mandate that an expert specifically testify that the victim is mentally defective, that the victim is incapable of appraising the nature of his or her conduct, or even that an expert is unequivocally required to prove that a victim is mentally defective. *See State v. Lamar Ross,* No. W2003-02823-CCA-R3CD, 2004 WL 2715348, at *6-8 (Tenn. Crim. App. Nov. 22, 2004) (Two individuals' non-expert testimony that the victim had been diagnosed with an intellectual disability and mood disorder, an investigator's testimony that the victim was "a little slow," and the jury's observation of the victim while the victim was testifying were sufficient to prove the victim was mentally defective.); *State v. Jeffrey Edward Pitts*, No. 01C01-9701-CC-00003, 1999 WL 144744, at *4 (Tenn. Crim. App. Mar. 18, 1999) (The testimony of the victim's father regarding the victim's capabilities, non-expert testimony that the victim's IQ was below sixty-nine, and the jury's observations of the victim while he was testifying were sufficient to prove the victim was mentally defective.). Rather, *Schaller* notes that objective evidence that a victim is mentally defective will ordinarily be introduced by a "psychologist, psychiatrist, or other expert medical personnel." *Schaller*, 975 S.W.2d at 318. It is from these objective facts, in conjunction with the other testimony at trial, that the jury can determine whether the victim is mentally defective.

Here, taking the evidence in the light most favorable to the State, the evidence was sufficient to prove that the victim was mentally defective. Mr. Adams diagnosed the victim

with a mild intellectual disability. The victim had an IQ of fifty-five. Dr. Johnson testified that the victim's motor skills were determined to be at the age equivalent of six years, eight months. His age equivalent for personal living skills was ten years. His age equivalent for community living, which is one's ability to interact and be independent within a community, was assessed to be five years, ten months. Finally, the victim's social and communication skills, which are one's ability to express themselves clearly, comprehend what other people are saying, and interpret social cues, were determined to be at the age equivalent of four years, one month. All of these scores were considered, and the victim was found to have an overall adaptive level of six years, eight months. Mr. Adams also testified that the victim would have "significant limitations" because his "basic cognitive functions were significantly behind other people his age." Ms. Avery and Ms. Todd testified that the victim required supervision twenty-four hours per day because in the past, he had accidently overdosed himself on medication and was unable to care for himself. Ms. Todd also testified that the victim was "easily manipulated." Sergeant Twilley described his interview with the victim as "a challenge."

The members of the jury also observed the victim during his testimony and could use those observations when assessing his mental capacity. Although the *Schaller* court considered a victim's competency to testify when making its determination regarding whether a person was mentally defective, the fact that the victim was allowed to testify does not undercut the finding that the victim was mentally defective. While relevant, the trial court's determinations that the victim knew the difference between a truth and a lie and that the victim was competent to testify are not the same as determining whether the victim could appraise the nature of his conduct. *See* Tenn. Code Ann. § 39-13-501(3). The Fourth District Court of Appeals of Florida highlighted this difference by stating:

> We do not see a problem . . . with a victim being found able to understand the moral obligation to testify truthfully, and still being mentally defective under the statutory definition. It is not unusual for a child who is actually or mentally five years old to sufficiently understand the moral obligation to tell the truth so as to be competent to testify. Telling the truth is a basic value of our society which is drummed into the heads of children as soon as they are able to reason. The fact that such a child is competent to testify, however, is not inconsistent with being mentally defective . . . .

*Boman v. State,* 760 So.2d 1053 (Fla. 4th DCA 2000).

-14-

Although proof that a victim has an intellectual disability does not by itself prove that the victim is mentally defective, the State presented evidence of the victim's cognitive and adaptive abilities and limitations as well as testimony from individuals who have interacted with the victim. We conclude that there was sufficient evidence for the jury to determine that the victim was "mentally defective" under the statute. *See* Tenn. Code Ann. § 39-13-501(3).

Finally, appellant argues that even if the State presented adequate proof that the victim was mentally defective, the State failed to prove that appellant knew or should have known that the victim was mentally defective. However, appellant was the victim's State-provided caregiver, who rendered daily care to the victim due to his intellectual disability. She had also successfully completed the DIDD's training for caregivers, which included training on the maltreatment of vulnerable adults. We conclude that there was sufficient evidence for the jury to infer that appellant knew or should have known that the victim was mentally defective. Based on the foregoing, appellant is without relief on this issue.

## 2. Abuse of an Adult

With respect to this conviction, appellant argues that the State failed to prove that the victim suffered any physical or mental harm or that appellant deprived him of any services necessary to maintain his health and welfare. The State concedes error in the trial court with regard to this count of the indictment.

The State acknowledged that a verdict of guilty for "abuse or neglect" is subject to alternate theories based on

> infliction of physical pain, injury, or mental anguish, *or* the deprivation of services by a caretaker that are necessary to maintain the health and welfare of an adult or a situation in which an adult is unable to provide or obtain the services that are necessary to maintain that person's health or welfare.

Tenn. Code Ann. § 71-6-102(1)(A), -117 (emphasis added). The trial court read the standard jury instruction at the close of the proof, which encompassed definitions of both abuse *and* neglect. *See* T.P.I.-Crim. 29.14(b). Following the reading of the jury instructions, the State asserted during its closing argument that the jury could rely upon harm done to the victim to establish abuse or deprivation of services from the victim to establish neglect in assessing

appellant's guilt on this count. The indictment itself failed to narrow the facts upon which the State was relying, as well. Moreover, the State concedes that the "neglect" theory was only supported by appellant's confession, in violation of prevailing case law.

The Tennessee Constitution grants criminal defendants the right to a unanimous verdict before the jury may impose a conviction of a criminal offense. *See State v. Lemacks*, 996 S.W.2d 166, 169-70 (Tenn. 1999) (citing *State v. Shelton*, 851 S.W.2d 134 (Tenn. 1993); *State v. Brown*, 823 S.W.2d 576, 583 (Tenn. Crim. App. 1991)). "When the proof shows multiple offenses which each could sustain the allegations of the criminal charge, it is 'the duty of the trial judge to . . . properly instruct the jury so that the verdict of every juror would be united on the one offense.'" *State v. Kenneth Lee Herring*, No. M1999-00776-CCA-R3-CD, 2000 WL 1208311, at *6 (Tenn. Crim. App. Aug. 24, 2000) (quoting *Burlison v. State*, 501 S.W.2d 801, 804 (Tenn. 1973)). In the instant case, the jury had the choice of two theories – one of which, the State concedes, was impermissible – upon which it could base its guilty verdict for abuse of an adult charge. Because the potential for a non-unanimous and possibly illegal verdict existed with regard to this count, we reverse appellant's conviction and remand for proceedings consistent with this opinion.

## B. Claims with Regard to Sentencing

Appellant raises two challenges to the sentences she received: (1) the trial court improperly enhanced her sentences to maximum lengths in the ranges; and (2) the trial court erroneously imposed consecutive sentences.

## 1. Length of Sentence

Following the testimony and arguments of counsel, the trial court made its sentencing determinations. The trial court considered the statutory guidelines as well as the other requisite sentencing factors. Because appellant had no criminal record as either a juvenile or an adult, the trial court sentenced her as a Range I, standard offender.

The trial court found and attached great weight to the following enhancement factors: (1) that the victim was particularly vulnerable because of his age or physical or mental disability; (2) appellant treated the victim with exceptional cruelty; (3) appellant committed the offenses for sexual gratification; (4) the personal injuries inflicted upon the victim were particularly great; (5) appellant abused a position of trust; and (6) appellant intentionally

-16-

selected the victim based on her perception of his disability. *See* Tenn. Code Ann.§ 40-35-114(4), (5), (6), (7), (14), (17). The trial court found as a mitigating factor that appellant's conduct neither caused nor threatened serious bodily injury but afforded it "some weight but not very much." *See id.* § 40-35-113(1).

Accordingly, the trial court sentenced appellant to twelve years for the rape conviction, to be served as a violent offender at one hundred percent release eligibility and two years for the conviction for abuse of an adult. However, having previously determined that the latter conviction must be reversed and remanded, we confine our review to the propriety of appellant's twelve-year sentence.

In determining an appropriate sentence, a trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant makes on his own behalf as to sentencing; and (8) the potential for rehabilitation. Tenn. Code Ann. §§ 40-35-103(5), -113, -114, -210(b). In addition, "[t]he sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." *Id.* § 40-35-103(4).

Pursuant to the 2005 amendments, the Sentencing Act abandoned the statutory presumptive minimum sentence and rendered enhancement factors advisory only. *See id.* §§ 40-35-114, -210(c). The 2005 amendments set forth certain "advisory sentencing guidelines" that are not binding on the trial court; however, the trial court must nonetheless consider them. *See id*. § 40-35-210(c). Although the application of the factors is advisory, a court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114." *Id.* § 40-35-210(b)(5). The trial court must also place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing." *Id*. § 40-35-210(e). The weighing of mitigating and enhancing factors is left to the sound discretion of the trial court. *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008). The burden of proving applicable mitigating factors rests upon appellant. *State v. Mark Moore*, No. 03C01-9403-CR-00098, 1995 WL 548786, at *6 (Tenn. Crim. App. Sept. 18, 1995). The trial court's weighing of the various enhancement and mitigating factors is not grounds for reversal under the revised Sentencing Act. *Carter*, 254 S.W.3d at

345 (citing *State v. Devin Banks*, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *48 (Tenn. Crim. App. July 6, 2007), *aff'd as corrected*, 271 S.W.3d 90 (Tenn. 2008)).

When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). If a trial court misapplies an enhancing or mitigating factor in passing sentence, said error will not remove the presumption of reasonableness from its sentencing determination. *Id.* at 709. This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *See Carter*, 254 S.W.3d at 346. The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In considering appellant's sentence in this case, the trial court properly considered the relevant statutory authority and other sentencing criteria. As the State noted, appellant concedes the trial court's application of enhancement factors (7) and (14), that appellant was committed the offense for sexual gratification and that appellant abused a position of trust. *See* Tenn. Code Ann. § 40-35-114(7), (14). She contests the trial court's findings with regard to the remaining four enhancement factors and the trial court's failure to apply additional mitigating factors. We address each argument in turn.

a. *The Victim Was Particularly Vulnerable Because of Age or Physical or Mental Disability*

Tennessee Code Annotated section 40-35-114, subsection (4), provides that a trial court may enhance a sentence where "[a] victim of the offense was particularly vulnerable because of age or physical or mental disability." Enhancement factors may not be considered if they constitute elements of the charged offense. *State v. Walton*, 958 S.W.2d 724, 729 (Tenn. 1997) (citing Tenn. Code Ann. § 40-35-114). The determination of whether an enhancement factor applies must be made on a case-by-case basis. *Id.*

Appellant argues that this enhancement factor is inapplicable in her case because the victim's mental disability was an element of rape as charged in the indictment. *See* Tenn. Code Ann. § 39-13-503(a)(3) (defendant knows or has reason to know that the victim is mentally defective or mentally incapacitated). She posits that because the State had to establish that the victim was mentally disabled, this fact cannot be relied upon to establish vulnerability.

Our supreme court has refined the definition of the "particularly vulnerable" enhancement factor:

> [T]he factor applies only because a victim is "particularly vulnerable," not because the victim is a certain age: "the relevant inquiry is not simply whether the victim is under the age of thirteen, but instead whether the victim was *particularly vulnerable* because of age or physical or mental disability." *State v. Adams*, 864 S.W.2d 31, 35 (Tenn. 1993) (emphasis in the original).

In *Adams*, we stated:

> We are of the opinion that the vulnerability enhancement relates more to the natural physical and mental limitations of the victim than merely to the victim's age . . . . The factor can be used in an aggravated rape case if the circumstances show that the victim, because of his [or her] age or physical or mental condition, was in fact "particularly vulnerable," i.e., incapable of resisting, summoning help, or testifying against the perpetrator. This is a factual issue to be resolved by the trier of fact on a case by case basis. The State bears the burden of proving the victim's limitations rendering him or her particularly vulnerable.

> *Id.*

We recently reiterated that the victim's age does not alone justify application of this enhancing factor:

Although it is not difficult to imagine cases in which the victim's age, whether very young or very old, may seem to equate with vulnerability, we chose in *Adams* not to presume such a conclusion in any case. Moreover, because Tenn. Code Ann. § 40-35-114(4) does not speak to specific ages, but rather to vulnerability, we could not create a bright-line rule. *State v. Poole*, 945 S.W.2d 93, 96 (Tenn. 1997) (footnote omitted).

Upon remand, in determining whether the State has established applicability of this enhancement factor, the trial court should consider (1) whether the victim, because of age or mental or physical attributes, was particularly unable to resist the crime, summon help, or testify at a later date; (2) whether victim's age (extremely old or extremely young) is entitled to additional weight; and (3) whether the vulnerability of the victim made the victim more of a target for the offense or, conversely, whether the offense was committed in such a manner as to render the vulnerability of the victim irrelevant. *Id*. at 96-97.

*Walton*, 958 S.W.2d at 729. Although our supreme court discussed "particular vulnerability" in the context of age in *Walton* and *Adams*, we employ the same analysis in determining the applicability of this enhancement factor to a case involving a mentally disabled person. Thus, for this court to reach a conclusion about the pertinency of this enhancement factor, we apply the standard set forth in *Walton*.

We have scrupulously reviewed the record in this matter. The victim testified twice, once at a competency hearing and once at trial. Our interpretation of his testimony is that it was all but unintelligible. In addition, expert testimony placed the victim's communication skills at the level of a child of four years, one month. These factors weigh heavily in favor of a finding that the victim's mental attributes rendered him particularly vulnerable in terms of his being able to disclose what had occurred and recount the events in court. We do not, however, find that the degree of his mental disability entitles his lack of communication skills to additional weight. Finally, with regard to whether the victim's vulnerability made him more of a target for appellant, we answer in the affirmative. It was the victim's very disability that placed him in a position for appellant to commit the offenses against him. As the trial court noted, appellant "basically had full care, custody[,] and control . . . of [the victim]." He depended on appellant to provide for all of his needs. We conclude that under the facts of this case, apart from the victim's disability being an element of the indicted offense, the circumstances establish that he was *particularly* vulnerable to appellant's criminal behavior. The trial court properly applied this factor.

b. *Exceptional Cruelty*

The trial court found that appellant treated the victim with exceptional cruelty. Tenn. Code Ann. § 450-35-114(5). Appellant argues that this factor was not established by the facts. The State counters that appellant committed an act of mental cruelty, which is sufficient under our case law.

The State relies on *State v. Thomas Lebron Mills and Carl Franklin Mills*, C.C.A. 936, 1985 WL 4562, at *2 (Tenn. Crim. App. Dec. 19, 1985), in support of its position that acts of mental cruelty will sustain a trial court's finding of this enhancement factor. In that case, the victim was a seventy-year-old female. Appellants in that case:

> (1) told the victim they were going to kill her by either burning her house down or by "blowing her brains out;" (2) stated, "Let's cut her and make a believer out of her;" (3) told the victim that they would get her if she contacted the police; (4) dragged the victim about the house in search of valuables; and (5) held a screwdriver to the victim's throat. Considering these facts, it would be an understatement to relate that the victim feared for her life. The trial judge held that the appellants treated the victim in a mentally cruel manner . . . . The appellants argue that "exceptional cruelty[]" . . . implies some sort of physical torture and that it should not be interpreted to encompass acts of mental cruelty. We disagree. Acts of mental cruelty in and of themselves can be just as vicious and leave just as many scars as acts of physical cruelty.

*Id.* (internal citations omitted).

In contrast with the facts of this case, wherein appellant did not threaten the victim in any way, we conclude that any acts of mental cruelty committed by appellant did not rise to the level of "exceptional cruelty." However, the trial court's error was harmless in light of the remaining viable enhancement factors. *See Bise*, 380 S.W.3d at 709 (misapplication of an enhancing or mitigating factor in passing sentence will not remove the presumption of reasonableness from its sentencing determination).

c. *Appellant intentionally selected the victim in this case based on her perception of his disability*

Appellant contends that the trial court erred in applying this enhancement factor because there was no proof in the record to support this conclusion. The State posits that the proof permitted the trial court to infer this factor.

Neither party offers this court any citation to legal authority to support its position. Upon our review of the record, we do not conclude that this enhancement factor applies. The testimony established that appellant was sexually active and had been involved with several different partners. Moreover, appellant was eager to recount her experiences to anyone willing to listen and in environments in which others could easily eavesdrop. We cannot conclude that she selected the victim because he would be unlikely to reveal her crimes to anyone. Rather, she selected the victim because she was motivated to gratify her desire for sexual pleasure. Again, although we decline to apply this enhancement factor, said error by the trial court will not remove the presumption of reasonableness on appeal. *See id.*

d. *Injuries inflicted upon the victim were particularly great*

Appellant argues that the trial court erred in applying this enhancement factor. The State argues that the victim's psychological injuries supported the enhancement factor. We agree with the State.

As in initial matter, appellant states that the trial court "sua sponte" found this enhancement factor. We note that the trial court is not bound by the state's recommendations or limited to only those factors presented by the State. *See State v. Albert Franklin*, No. 02C-01-9404-CR-00081, 1994 WL 697928, at *1 (Tenn. Crim. App. Dec. 14, 1994) ("The court may apply any enhancement factor that is supported by the evidence at the trial, the sentencing hearing, or the pre-sentence report."). The trial court did not improperly consider an enhancement factor not advanced by the State.

Addressing for the first time the "quantum of proof required to make [the] determination" of whether this factor applies, our supreme court obviated the need for expert testimony and held that "application of this factor is appropriate where there is specific and objective evidence demonstrating how the victim's mental injury is more serious or more

severe than that which normally results from this offense." *State v. Arnett*, 49 S.W.3d 250, 260 (Tenn. 2001). The court also recognized

> that [while] all victims of crime, certainly victims of rape, must surely experience mental trauma, we are aware that no two crimes are exactly the same, and no two victims react to this crime in the same manner. Because some victims may suffer even more severe emotional trauma than is normally involved with this offense, our legislature has seen fit to enhance the punishment for those defendants causing "particularly great" psychological injury.

*Id.* Applying this standard, we review the trial court's findings in support of this factor.

In finding that this factor applied in this case, the trial court noted:

> The sentencing testimony from both witnesses . . . that as a result of this offense and as a result of this trial, . . . [the victim] has had a regression, . . . [and] he is now being referred to additional counseling[.] [H]e is beginning to act out inappropriately, his behavior has changed, . . . he is engaging in [and] soliciting inappropriate touching, . . . he is becoming more inclined for hugging or wanting hugging, and they have to get him refocused[.] [T]hey have to get him . . . rechanneled because this offense and this trial have changed his behaviors [and] changed his days.

> The testimony at trial was that[] before this happened, [the victim] used to be a very outgoing, very easygoing person, very affable personality, was always happy to see people, always smiling[,] and that this has changed him. He is now exhibiting anger outbursts, and there's a spike in inappropriate touching and other behavior. And what Ms. Todd has told the Court, in the twenty years of working in this business, she has ever experienced anything like what [appellant] did to [the vicitm].

> And this Court does find that the personal injuries inflicted upon [the victim] . . . in fact[] were particularly great. It has totally changed a thirty-three-year-old who was living at an age range of something from four to ten years . . . of age, and as a result of what [appellant] has done to [him], this

Court finds that the emotional damage that she has done to [the victim][,] who was already particularly vulnerable, this Court finds that the emotional injuries are particularly great and gives great weight to that finding.

We agree with the trial court that the emotional injuries inflicted upon the victim were particularly great. We credit the findings made by the trial court and conclude that it properly applied this enhancement factor.

### 4. Consecutive Sentence Alignment

We have previously determined that appellant's conviction for abuse of an adult cannot stand, and we reverse and remand that conviction. Thus, consecutive sentence alignment is no longer an issue for our consideration. Although the State conceded that the conviction for abuse of an adult was improper, it nonetheless addressed the propriety of consecutive sentencing. We surmise that the State did so in the event of a re-trial on this count of the indictment. However, consecutive sentencing, in the procedural posture of this case as it stands now, does not present a "justiciable controversy." *State v. Rogers*, 703 S.W.2d 166, 169 (Tenn. Crim. App. 1985) ("An appellate court will not pass on lawsuits when there is no justiciable controversy presented, or render advisory opinions on questions which are premature and contingent and may never arise in the future."); *see also State v. Ward*, 138 S.W.3d 245, 272 (Tenn. Crim. App. 2003) ("We are unable to foresee what evidence will be offered by either party at a retrial, and therefore, we decline to give in effect an advisory opinion . . . ."). We decline to extend our review to sentence alignment in this case.

## CONCLUSION

Based on the parties' arguments, the record, and the applicable law, we affirm appellant's conviction for rape and her sentence of twelve years. We reverse appellant's conviction for abuse of an adult and remand for proceedings consistent with this opinion.

_____

ROGER A. PAGE, JUDGE